## JOHN DEERE PLOW CO. v. McDAVID.

### In re JOHN DEERE PLOW CO.

(Circuit Court of Appeals, Eighth Circuit. April 19, 1905.)

No. 2,117, 43.

**1. CONTRACTS—CONSTRUCTION—CONDITIONAL SALES—AGENCY.**

Claimant contracted to consign goods to a bankrupt according to schedules and certain requests of the bankrupt, which agreed to pay transportation charges, furnish warehouse room, pay taxes, licenses, and rents, keep the goods insured, and be personally liable for any damage to goods while in its custody, to make all reasonable efforts to sell the goods, not to sell other makes to the exclusion of goods consigned under the contract, and to sell for enough more than the net schedule prices to pay freight, taxes, expenses, charges, and commission for handling and selling the goods, which should be the difference between the net amounts and the gross amounts received from the sales. The contract expressly provided as to what warranties should be given, and entitled claimant to require the goods to be returned. The bankrupt ordered goods under this contract, agreeing to pay therefor in par funds or give notes, and agreed that the title and ownership of all goods should remain in the claimant, which should be subject to its order until paid for. *Held,* that the contract was one of agency, and not a contract of conditional sale.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 1335.]

**2. SAME—PREFERRED CLAIMS—TRUST FUNDS.**

Where a bankrupt improperly mingled funds belonging to its principal with its own funds, and it was not shown that the trust funds, either in their original or a substituted form, came into the hands of the bankrupt's trustee, the principal was not entitled to a preference therefor.

[Ed. Note.—For cases in point, see vol. 6, Cent. Dig. Bankruptcy, § 539.]

**3. FEDERAL COURTS—RULE OF DECISION.**

Whether a creditor of a bankrupt is entitled to a preference on the ground that the claim is based on the bankrupt's misappropriation of a trust fund, does not depend on the construction of the contract between the parties, but on a rule of preference in equity, as to which the federal decisions, and not those of the state where the contract was made, must control.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

Appeal from the District Court of the United States for the Western District of Missouri.

The following is the opinion of the court below (Philips, District Judge):

The statute of this state (section 3412, Rev. St. 1899) provides that: "In all cases where any personal property shall be sold to any person, to be paid for in whole or in part in installments, or shall be leased, rented, hired or delivered to another on condition that the same shall belong to the person purchasing, leasing, renting, hiring or receiving the same whenever the amount paid shall be a certain sum, or the value of such property, the title to the same to remain in the vendor, lessor, renter, hirer or deliverer of the same, until such sum, or the value of such property, or any part thereof, shall have been paid, such condition, in regard to the title so remaining until such payment, shall be void as to all subsequent purchasers in good faith, and creditors, unless such condition shall be evidenced by writing executed, acknowledged and recorded as provided in cases of mortgages of personal property." This statute was enacted to put an end to the abuses incident to what is known in this state as "conditional sales of personal prop-

erty," whereby, under agreements between the vendor and vendee, undisclosed to the public, the title to the property should remain in the vendor in the nature of a lien until the purchase money should be paid. Upon the faith of the ostensible ownership of the party in possession, credit would be extended to him by third parties, and when they sought to subject the property to attachment or execution such vendor would interpose, and claim the property under the assertion that the title had never passed from him. To effectuate the declared public policy of the state in this statute, the courts of this state have given to it a broad and rigid construction, to the effect that its policy was for "inspiring confidence that in all sales of personal property, when possession was delivered to the vendee, as to creditors and purchasers the vendor's title must be held to have been absolutely passed, unless upon the public registry books of the land there appear in the manner provided by law some reservation of a right therein." Straus v. Rothan, 102 Mo. 266, 14 S. W. 940. Or, as stated in Johnson-Brinkman Co. v. Central Bank, 116 Mo. 571, 22 S. W. 813, 38 Am. St. Rep. 615, it "was manifestly intended to invalidate numerous devices which had sprung up for the evasion of the statute." This court's observation is that no class of business concerns so assiduously and persistently seek to circumvent and get around this statute as manufacturers and vendors of machinery, and the like, who seek to exploit their products in the country districts through local agents. Unwilling, for trade reasons, to sell outright on credit, or to not have it known to the public the terms upon which the goods are committed to the given party for sale, they call to their assistance the most astute counsel to construct contracts after such a fashion that, while imposing upon the retailer all the burdens of a purchaser, if insolvency or bankruptcy overtake him he may be held technically to be a mere factor. This court is constantly plagued with these controversies, when it is within the power of such merchants by a plain and unambiguous contract to place its relationship to such goods beyond reasonable debate. And it is a wholesome rule that where such contracts, drawn by such claimants, are ambiguous or uncertain, to construe them most strongly against the claimant. Gillet v. Bank, 160 N. Y. 549, 55 N. E. 292.

In re Rabenau, 118 Fed. 471, this court took the pains to discuss in detail a contract quite germane in many important respects to the one under review. In recognition of the principles of law therein announced this court thought, in affirming the action of the referee, that was decisive of this case. The propositions there asserted, supported by controlling authorities, may be summarized as follows: If the goods are consigned to be sold for the consignor, who is to regulate the price and terms of sale, the factor is an agent, and the contract is one of bailment. But if the consignee is to sell upon terms fixed by himself, and is bound to pay to the consignor a fixed price, the contract is one of sale. If the consignor may sell at any price he likes, and receive payment, though he is bound if he sells the goods to pay the consignor for them at a fixed price and a fixed time, it is a sale. When the identical thing delivered is to be restored, or in its altered form of money, the contract is one of bailment, and the title to the property is not changed; but when there is no obligation to restore the specific article, and the receiver is at liberty to return another thing of equal value or the money value, he becomes a debtor to make a return, and the title to the property is changed; it is a sale. And, further, it is of no consequence how often or positively it may be asseverated, in the form of the contract, that the party of the first part, as principal, consigns to the party of the second part, as agent, on commission, and the like. This will be treated by the courts as mere words without controlling effect, if, taking the whole instrument by its four or eight corners, and all the collateral facts, in pari materia, it appears in its essence to be that the consignee is at liberty to sell at a price and on terms fixed by himself, being answerable to the owner for a fixed price, it is none the less a sale.

Stripped of mere formalism, it is apparent from the contract in question that the burdens cast upon the Hymes Buggy & Implement Company are what would be imposed upon and assumed by any vendee. It was to pay freightage, the taxes, the insurance, to house and care for the goods, pay all expenses of their sale, and to bear any and all loss of their destruction or de-

terioration, while answerable to the party of the first part for the fixed price. I am unable to find in this contract any express provision fixing a time when the consignee could, of his own motion, return the goods. The only provision touching this aspect of the case is the following: "It is further agreed that this contract is to remain in force unless cancelled and annulled by said first party until Oct. 1st, 1904, at which time said second party agrees if required by said first party, to return all goods remaining on hand unsold at the expiration of this contract to them at their warehouse in Kansas City, in good order and free of all freights and charges." From which it appears that the return of any unsold goods depended solely upon whether it be "required by said first party." If the party of the first part does not require the return, the party of the second part cannot compel it. The contract in this respect is wholly unilateral.

Turning to the testimony of the managing representative of the claimant, it appears that at the end of each year the agent of the company visited the house of Hymes Buggy & Implement Company and took an inventory of the goods on hand, and left them there. In its practical effect, this was nothing more than means of ascertaining whether or not the house had sold more goods than it had accounted and paid for. There was no time fixed when this process or course might end, except that, "should the second party hereto sell out or otherwise dispose of his business at any time prior to the expiration of this contract, the right to declare this contract cancelled and annulled from and after the date of such sale or transfer is reserved to party of first part without prejudice." Aside from this provision, bearing the earmarks of a conditional sale, its evident purpose was to safeguard the vendor against loss in such contingency. If the Hymes Buggy & Implement Company sold the goods on time, it was required to take good notes, guarantied by its indorsement thereon. The object of this clearly was to better the security of the vendor for the purchase money. The balance, after satisfying the vendor's claim, was to be returned to the vendee. Just as in the case of other conditional sales, the goods were to be paid for when sold by the vendee for cash. The so-called consignee, like any other vendee, was left at full liberty to sell the goods at any price he might obtain, and pocket the profits; and, if he saw fit to sell at a less sum than that for which he was to respond to the vendor, he must pocket the loss. The fact that the consignee was to report monthly his sales, and make payments thereon, does not alter the status of the vendor and vendee. In re Rabenau, 118 Fed., loc. cit. 475.

The Court of Appeals of this state (which has most to do with these transactions because the amount in controversy usually makes that the court of last resort) gives to such contracts under the state statute the construction in harmony herewith. In Bicking v. Stevens, 69 Mo. App. 168, it is held that, where the consignee is to sell the consigned goods upon terms fixed by himself, and is bound to pay the consignor a fixed price at stated times, the contract is one of sale; "and the fact that the payment is to be made on the contingency of the consignee's selling does not affect the character of the transaction as a sale." The contract there provided that the consignor should ship out the goods on consignments, to be sold on the consignor's account. The consignee was, on the 1st of each month, to render an account of the amount of sales made during the previous month; and, just as in the case at bar, he was to itemize the goods remaining unsold in stock. The accounts of sales were rendered, accompanied with note or cash for goods sold during the previous month. The court held that "the time in which the purchase money was to be paid—whether in so many days or months, or upon the happening of some contingent event, as a resale—did not affect the character of the transaction as a sale. The provision in relation to payment did not suspend the transfer of title. The sale was complete and the title passed when the goods were delivered and the purchaser put in full possession and control of them." The court cited and reviewed the authorities on this question, fully sustaining the proposition.

There is another fact in this case. In the Exhibit C, which is an account of part of the goods in controversy, shipped on the 15th day of September, 1901, is set out on its face the contract of sale. with terms and prices different from the contract in question. These stipulations are as follows: "The

goods as below enumerated to be well made, of good material, and to work when properly managed, according to the Manufacturer's Printed Warranty. I, or we, hereby agree to make you payment for same in Kansas City par funds. (Exchange and Express charges prepaid.) If account is not paid when due, to draw interest at ten per cent from maturity. I, or we, hereby agree to give notes or acceptances for the amount of goods, as per terms of payment, when called upon to do so, and to make no claim for shortage or damage after ten days from receipt of goods. No interpretation or verbal understanding of this contract not mentioned herein, will be recognized. All orders taken subject to approval of John Deere Plow Co., and also agree that the title to and ownership of all goods which may be shipped as herein provided, shall remain in, and their proceeds in case of sale, shall be the property of John Deere Plow Co., and subject to their order until full payment shall have been made. If owing to the large lines you carry, you find it necessary to ship sort a portion of the orders, you may do so and we will make no claims for any allowance therefrom. Prices subject to change without notice." This falls exactly within the inhibition of the statute respecting conditional sales. It also appears from the findings of the referee that the bills rendered by the claimant, on which the goods were shipped, contained the following: "Sold to the Hymes Buggy & Implement Company." In Cooper Wagon & Buggy Co. v. Wooldridge, 98 Mo. App. 648, 73 S. W. 724, it is held that, where the application of the purchaser for goods expressed a conditional sale, the vendor wrote on the bill of sale the words, "Terms: Comm. Con.," indicating commission consignment, it was held that, notwithstanding the words "Terms: Comm. Con.," the contract was a sale, and not on commission. It is true that in Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093, it was held that, where the contract of sale was clearly expressed in a written contract between the parties, it could not be varied by the terms of the printed billhead of the invoice. But it does not control this case, in so far as the bill of sale above referred to is concerned, for the reason that the bill of sale on its face shows that the Hymes Buggy & Implement Company, in its written application for the goods, specified that they should be sold upon the conditions and terms therein specified; and when the goods were shipped thereon, it was an acceptance of the offer, and made a specific contract. Bankr. Act July 1, 1898, c. 541, § 70, 30 Stat. 566 [U. S. Comp. St. 1901, p. 3451], defines the title which the trustee in bankruptcy acquires. Subdivision 5, in specifying the property which passes to the trustee, says: "Property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him." Under this contract the Hymes Buggy & Implement Company had the right to sell the goods to whom and at what prices it pleased, being answerable only to the claimant for a fixed sum; and beyond question the purchaser would have acquired a good title as against the claimant. As held in Re Pekin Plow Company, 112 Fed. 308, 50 C. C. A. 257, and in Moline Plow Company v. Spilman (D. C.) 117 Fed. 746, the trustee in bankruptcy stands in the same position as the creditors of the estate pursuing goods under legal process. Therefore the trustee is entitled to claim the goods as against the vendor under a conditional sale. This view of the law is affirmed in McFarlan Carriage Co. v. Well, 99 Mo. App. 642, 74 S. W. 878.

In respect of the case of In re Galt, 120 Fed. 64, 56 C. C. A. 470, without conceding its controlling effect upon the statute of this state as construed and applied by its courts, it is sufficient to say that the contract in that case was materially different in important particulars from the one at bar. In that case the contract specifically fixed "the sum of 5 per cent. on all cash sales." It is also provided that the consignee was "to settle for all wagons sold by him as agent, make all sales and take all evidence of indebtedness therefor for and in the name of said party of the first part, upon such blanks as the party of the first part shall furnish, and remit the cash and notes received for said wagons to the party of the first part in the following manner: the cash to be remitted as early as the day following the date of sale, by draft, etc., payable to the order" of the consignor, "and the notes to be transmitted every thirty days, or as much oftener as said second party may de-

sire." The contract also specifically provided that "the party of the second part further agrees to sell all wagons shipped him under the within agreement within twelve months from the date of shipment, and in case of any failure or neglect to do so agrees to settle at the expiration of that time, or at any time thereafter when called upon to do so, for all wagons and parts of wagons remaining on hand unsold, [at] prices hereinbefore stated," in a certain manner. From which it is apparent that the contract not only fixed the price at which the property should be sold, but the amount of the consignee's commission, and it fixed a time when, and the conditions on which, the property consigned might be returned.

Counsel for claimant calls special attention to the case of Metropolitan National Bank v. Benedict Company, 74 Fed. 182, 20 C. C. A. 377. That case, in its controlling facts, is essentially different from the one under consideration. The Benedict Company, owner of the goods, by correspondence with Stern Auction & Commission Company, consummated an agreement between them by which the latter company consented to take the goods by an acceptance in writing, which specified on its face that they took them under consignment, to be sold at the prices submitted in the letter from the Benedict Company, with an express agreement that it would sell "without any charges of commission." The memorandum acceptance furthermore provided for a specific time when the agreement should expire, "that no part of the assignment (consignment) shall remain unsold or unpaid for by February 1st, 1895." Unquestionably, if at the end of that time the goods remained unsold and unpaid for, restitution belonged to the assignor. And therefore, when the Metropolitan National Bank, with notice of this agreement, took an assignment in the nature of a mortgage on the goods to secure a debt of Stern Auction & Commission Company to the bank, it was properly held that as between the parties it was a consignment on bailment. Judge Caldwell, who wrote the opinion, laid much stress upon the construction given to this agreement by the parties thereto. But surely he did not mean to say that any unknown construction placed upon the contract by the parties thereto could affect the rights of third parties who had dealt with the consignee as the apparent owner, in ignorance of such private interpretation. Throughout the examination of the managing agent of the claimant in the case at bar, its counsel, by leading questions pregnant with suggestive answers had this agent state that the contract in question was simply a consignment on commission; but when this question was put to Mr. Hymes, the managing party of the Hymes Buggy & Implement Company, he answered, in effect, that the contract would have to speak for itself.

Other reported cases are pressed upon the consideration of the court by claimant's counsel, which are not deemed in point, or of controlling effect, as they depend upon states of fact easily differentiated from the contract in question.

In conclusion, it does seem to me that, if wholesale dealers can set up a retail merchant, as in this case, in a large establishment, with no outward or visible sign of the bailment or agency, enabling him to obtain credit on the faith of his apparent ownership, and then, when attachments or bankruptcy overtake the debtor, come forward with concealed contracts of so ambiguous and double aspect as this contract presents, and maintain a special ownership in the remnant of the debtor's goods, the state statute, designed to put an end to secret liens or ownership, is of no avail.

Independent of the foregoing considerations, there is a fatal objection to the claim as a preferred creditor to the extent of the $1,442.25 on account of goods sold, and not paid for by the bankrupt. There is no evidence in this record tending to show that this money was on hand at the time of the adjudication in bankruptcy, or that it went into or was mingled with the mass of assets that passed to the control of the trustee in bankruptcy. Metropolitan National Bank v. Campbell Com. Co. (C. C.) 77 Fed. 705; Bircher v. Walther, 163 Mo. 461, 63 S. W. 691. So far from the claimant's evidence bringing the claim within the rule laid down in the foregoing cases, the testimony of the witness Hymes, introduced by the claimant, is that the money realized on sale of the goods "was deposited in bank, used in the business, or sent to the

John Deere Plow Company." This is far short of the proof required under the equity rule.

It results that the motion for rehearing is denied.

Tom H. Reynolds (Thomas R. Morrow and James P. Gilmore, on the brief), for appellant.

John S. Farrington and W. A. Rathbun, for respondent.

Before SANBORN, Circuit Judge, and RINER, District Judge.

RINER, District Judge. This was a case brought here on appeal from a decision of the District Court affirming an order of a referee in bankruptcy refusing to direct the return of certain personal property in the hands of a trustee, and to allow certain claims as preferred claims against the estate in favor of appellant and petitioner, John Deere Plow Company (hereinafter called the "Plow Company"), and also upon a petition for review. Under a stipulation of the parties, both cases are to be considered upon the same record.

In May, 1904, the Hymes Buggy & Implement Company (hereinafter called the "Implement Company"), a copartnership, was declared a bankrupt upon a petition in involuntary bankruptcy brought by the creditors of that firm, and the case was sent to a referee. The plow company presented a petition to the referee, in which it set forth that on the 15th day of September, 1903, it entered into a written contract with the implement company for the consignment of goods to be sold on commission; that under the contract certain goods, wares, and merchandise were consigned to the implement company for sale on commission and at the time of the filing of the petition in bankruptcy the implement company had on hand goods consigned to it under the contract of the value of $1,390. It was also alleged that the implement company had sold, but had not accounted for to the plow company, certain other goods received and held under the contract to the amount of $1,442.25, and which sum the implement company had retained and placed in its own business, in violation of the terms and provisions of the contract and without the knowledge or consent of the plow company. The petition prayed for an order for the delivery of the goods unsold and for the allowance of the claim of the plow company for $1,442.25 as a preferred claim. The prayer of the petition was denied by the referee, and the case certified to the District Court, where the finding of the referee was affirmed.

The contract between the plow company and the implement company is in the following words:

"This agreement, made and entered into this 15th day of September, 1903. by and between John Deere Plow Co., of Kansas City, Missouri. incorporated under the laws of the State of Missouri, party of the first part, and Hymes Buggy & Impl. Co., of Springfield, County of Greene, State of Missouri, party of the second part.

"Witnesseth, That said first party, for and in consideration of the stipulations and agreements herein contained, have this day appointed and by these presents do hereby appoint the second party as their authorized agent at Springfield, Mo., for the sale, on commission, of the consigned goods and articles of merchandise designated hereon or enumerated and described on schedules of said second party, to be attached hereto as hereinafter provided.

"The party of the first part agrees to consign to and upon the written request of the said second party, so long as said party of the first part has the goods in stock to enable it so to do, during the continuance of this contract, the goods and articles of merchandise designated hereon, or on schedules or written requests of said second party hereafter made; said schedules or written requests to set forth the net amount to be received for the goods by the party of the first part after the goods shall have been sold by said party of the second part as such agent, and the place to which to be consigned, and when said written requests or schedules properly signed by said second party are accepted by John Deere Plow Co., they shall be attached and made a part of this contract, reference being made to same on the face thereof, subject to the following conditions, agreements and obligations:

"The party of the second part agrees as follows:

"1st. To receive from the Transportation Companies, and pay all transportation charges on same, the goods and articles of merchandise consigned under terms of this contract.

"2nd. To furnish proper warehouse room for all goods and articles of merchandise consigned under terms of this contract.

"3rd. To pay all Taxes, License, Rents and all other expenses incidental to the safe keeping and sale of the goods and articles of merchandise, and to waive all claims against John Deere Plow Co., for such expense.

"4th. To keep said goods and articles of merchandise insured for their full value, at expense of said second party, in the name and for the benefit of John Deere Plow Co., in Companies approved by them, and to turn over the policies to them, the said John Deere Plow Co., and in case of any neglect or failure to insure as herein provided, to become personally responsible for any loss or damage that may occur to said goods while in the custody of said second party.

"5th. To keep samples of said goods and articles of merchandise set up in salesrooms suitable for the purpose, and to make all reasonable efforts to sell the same; and not to sell any other makes of like goods and articles of merchandise to the exclusion of those consigned under the terms of this contract.

"6th. To sell the goods and articles of merchandise consigned under this contract for enough more (that) the net amounts to be received therefor by said party of the first part, as above stated, and set opposite said goods in the said written request and schedules attached, to pay all freights, taxes, expenses, charges, compensation and commissions for the handling and selling of said goods as herein provided, and the doing of all things herein provided to be done by the party of the second part; it being mutually understood that the said net amounts set opposite said goods in the attached schedules and written requests, are the net prices at which said goods and articles of merchandise are to be consigned for sale, and are the net amounts, which said second party agrees to account for and deliver to the John Deere Plow Co., for said goods when sold, as per terms of this contract. The full charges, compensation, commission and expenses of said second party for the handling and selling of said goods as herein provided, and the doing of all things herein provided to be done by the party of the second part, to be the difference between said net amounts and the gross amounts received from the sale of said goods.

"7th. To sell all goods and articles of merchandise consigned under this contract, subject to the Manufacturer's regular printed Warranty, and to settle all claims for breakage and defects in accordance therewith. And agrees not to part possession with any of the said goods until full and satisfactory settlement shall have been made for same by purchaser, and will not allow, under any circumstances, any of said goods to be taken away on trial before such settlement is made; and that all proceeds of such sales, whether cash, or notes, shall be kept separate and distinct from said second party's other business.

"8th. The second party further agrees to make out and render to the said first party, on the first day of each month, and oftener if so requested, a full and complete report of all sales, made the month previous, or since the last report made; and to accompany said report with a full settlement in

accordance with this contract for all goods so reported sold, said settlement to be made with cash for all sales less 5% discount for all cash, ———— months from date of same and bearing interest at ——— per cent., per annum from ———. And the second party further agrees that when purchaser's notes are given in settlement for sales made as herein provided, said notes will be on blanks furnished by John Deere Plow Co., and are to be taken only from good, prompt paying purchasers. And the second party further agrees to endorse all such notes given to said first party in the following manner, to-wit:

"For value received, I or we hereby guarantee the payment of the within note at maturity or at any time thereafter, and waive demand, protest, notice of protest and non-payment.

"9th. It is further agreed and understood, that the goods and merchandise to be supplied hereunder are to be consigned simply, and that the title to and ownership of all goods and articles of merchandise consigned to said second party under the terms of this contract, and all proceeds of the sale of same, shall remain vested in said first party, and be its sole property and subject to its order, until the full amount to be received for said goods, as herein provided, shall have been received by said party of the first part.

"It is further agreed that this contract is to remain in force unless cancelled and annulled by said first party, until Oct. 1st, 1904, at which time said second party agrees if required by said first party, to return all goods remaining on hand unsold at the expiration of this contract to them at their warehouse in Kansas City, in good order and free of all freights and charges.

"This contract is not transferable and should the second party hereto sell out or otherwise dispose of his business at any time prior to its expiration, the right to declare this contract cancelled and annulled from and after the date of such sale or transfer is reserved to party of the first part without prejudice.

"The second party hereby agrees to forward any goods received on this contract at any time, and as said John Deere Plow Co., or their authorized agents may direct, charging only actual cost of freight and drayage, collecting same from transportation company as back charges.

"It is also agreed that the contract held by John Deere Plow Co., is to be considered the original, and to be the binding agreement in case the duplicate varies from it in any particular. And that the same may be terminated at any time at the option of the John Deere Plow Co., and the goods remaining on hand unsold shall be subject to the same terms and conditions as herein provided for.

"It is understood and agreed that, in writing and printing, this paper contains the full and entire agreement between the parties hereto, and that no outside oral or written understanding with any traveling agent of John Deere Plow Co., is of any force or effect whatever.

"Executed in duplicate.

"Given under our hands this 15th day of September, 1903, in the town of Kansas City, County of Jackson, State of Missouri.

"John Deere Plow Co.
"Per C. S. Wright, Traveling Agent.

"Subject to the approval of John Deere Plow Co.
"Approved: Hymes Buggy & Implement Co.
"Party of the Second Part."

On the 15th of September, 1903, the implement company forwarded to the plow company an order for certain goods, which, so far as it is important in the determination of the questions involved in this case, is in the following words:

"Kansas City, Mo., 9/15/1903.

"John Deere Plow Co., Kansas City, Mo.—Gentlemen: Please ship us the following named articles from Moline, on or about soon as can, or as soon after as possible, marked Hymes Buggy & Implement Co., assemble at Moline, Springfield, Mo. Ship via ———. Prices below are based upon K. C. frt. allowed delivery.

"The goods as below enumerated to be well made, of good material, and to work when properly managed, according to the Manufacturer's Printed Warranty.

"I, or we, hereby agree to make you payment for same in Kansas City par funds. (Exchange and express charges prepaid.)

"If account is not paid when due, to draw interest at 10 per cent. from maturity.

"I, or we, hereby agree to give notes or acceptances for the amount of goods, as per terms of payment, when called upon to do so, and to make no claim for shortage or damage after ten days from receipt of goods.

"No interpretation or verbal understanding of this contract not mentioned herein will be recognized.

"All orders taken subject to approval of John Deere Plow Co., and also agree that the title to and ownership of all goods which may be shipped as herein provided, shall remain in, and their proceeds in case of sale, shall be the property of John Deere Plow Co., and subject to their order until full payment shall have been made.

"If owing to the large lines you carry, you find it necessary to ship short a portion of the orders, you may do so and we will make no claims for any allowance therefrom.

"Prices subject to change without notice.

"Order taken by C. S. Wright.

"Signed—Hymes Buggy & Implement Co.

| No. | Description of Goods. | Price. | Terms and Remarks. |
|-----|----------------------|--------|--------------------|
| * * | * * * * * * | * * | * * * " |

We think the questions presented by this record can all be disposed of on the appeal. Dodge v. Norlin (C. C. A.) 133 Fed. 363, 366, 367; Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 691, 48 L. Ed. 986. The case presents two principal questions: First, whether the contract and order above set out, taken together, constitute evidence of a conditional sale or of an agency; second, whether or not the plow company is entitled to have the sum of $1,442.25, the proceeds of sales of goods made under the contract, and which had not been paid to it, allowed as a preferred claim. We think it was an agency contract. It is not a contract in which the consignee can sell at any price, or on any terms he may choose, but, as we understand it, it is a contract or consignment of goods to be sold on commission by the consignee, as agent for the consignor, for cash. The plow company had the right, under the contract, to require the goods returned, and in this it lacks one of the necessary elements of a contract of sale, namely, to pay money, or its equivalent, for the goods delivered, with no obligation to return. In the case of Met. Nat. Bank v. Benedict Co., 74 Fed. 182, 20 C. C. A. 377, this court had under consideration a contract wherein the consignee agreed "to realize for consignment of ready-made clothing of Benedict Company, as per memorandum received of Henry Benedict, president of the Benedict Company, net prices as per memorandum, without any charges of commission, freight, or any other charges," and in which the consignee also agreed "to keep the amount of the consignment at all times, until the agreement expires, fully insured against fire or other damage, and that no part of the assignment shall remain un-

sold nor unpaid by February 1st, 1895." And the court held that the contract was not a sale, but a contract of factorage, which passed no title to the consignee. In disposing of the case, the court, speaking through Judge Caldwell, said:

"The money to be paid by the commission company was not upon a sale of the goods to that company, but upon a sale of the goods by that company. The commission company was never to pay for the goods as upon a purchase by it, but only to account for the proceeds of the sale of them at prices fixed by the contract."

Other authorities to the same effect are Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093; Davis v. National Exchange Bank, 91 U. S. 618, 23 L. Ed. 214; Hunt v. Wyman, 100 Mass. 198; Powder Co. v. Burkhardt, 97 U. S. 110, 24 L. Ed. 973.; Reaper Co. v. Raynor, 38 Wis. 119; Union Stockyards & Transit Co. v. Western Land & Cattle Co., 59 Fed. 49, 7 C. C. A. 660; Weir Plow Co. v. Porter, 82 Mo. 23; Mon. Man. Co. v. Jones, 96 Wis. 619, 72 N. W. 44; In re Galt, 120 Fed. 64, 56 C. C. A. 470. In the case last cited, in considering a contract quite similar to the one here, the court said:

"It was not contemplated that Galt should ever own these wagons. He was to sell them to others for the company; his commissions to be the amount which he might receive over the prices stated in the contract. The proceeds, whether in cash or in notes of the purchasers, were to be immediately returned to the company; the notes being guarantied by Galt. This was a del credere commission, and not a sale. The company could compel a return of the goods not sold. Galt had not the option to pay for them in money. Even with respect to the goods unsold within twelve months, the option for their return or payment was with the company, and not with Galt; and nowhere in the agreement does the latter covenant to pay for these goods, as in the case of a sale."

The contract in this case must be read in its entirety, and its construction is not to be gathered from any separate provision of it. It is upon the whole contract that we must search for the intention of the parties, and a careful scrutiny of the agreement before us, in the light of legal principles, compels us to the conviction that it must be held to be a contract of agency, and that the title to the goods in the hands of the implement company at the time of the adjudication in bankruptcy did not pass to the trustee.

A careful examination of this record and the adjudicated cases leads us to the conclusion that the plow company is not entitled to a priority over other creditors to funds in the hands of the trustee to the amount of $1,442.25, for the reason that it does not appear that any of the money received from the sale of goods made under the contract actually passed into the hands of, or are held by, the trustee. The owner of a fund which has been misappropriated by one who held it in trust cannot follow it in the hands of the trustee unless he can trace the trust fund in kind or in specific property into which it has been converted, or, if the fund has been mingled with the trustee's other property, to establish a charge on the mass of such property for the amount of this fund. In other words, he can secure a preference out of the proceeds of the estate of the insolvent only where he can trace the trust property or fund, in its original

or some substituted form, in the estate which comes into the hands of the trustee.

In the case of Spokane Co. v. First Nat. Bank, 68 Fed. 979, 16 C. C. A. 81, in disposing of a similar question, the court said:

"We are unable to assent to the proposition that, because a trust fund has been used by the insolvent in the course of his business, the general creditors of the estate are by that amount benefited, and that, therefore, equitable considerations require that the owner of the trust fund be paid out of the estate to their postponement or exclusion. * * * Both the settled principles of equity and the weight of authority sustain the view that the plaintiff's right to establish his trust and recover his fund must depend upon his ability to prove that his property is in its original or a substituted form in the hands of the defendant."

Met. Nat. Bank v. Campbell Com. Co. (C. C.) 77 Fed. 705; Bank v. Latimer (C. C.) 67 Fed. 27; Little v. Chadwick, 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570; Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504; Bank v. Armstrong (C. C.) 39 Fed. 684; Frelinghuysen v. Nugent (C. C.) 36 Fed. 229; Beard v. Ind. Pella City, 88 Fed. 375, 31 C. C. A. 562; Montagu v. Pacific Bank (C. C.) 81 Fed. 602; City Bank v. Blackmore, 75 Fed. 771, 21 C. C. A. 514; Standard Oil Co. v. Hawkins, 74 Fed. 395, 20 C. C. A. 468, 33 L. R. A. 739.

While conceding the rule to be as above stated, it is said on behalf of the plow company that this was a Missouri contract; therefore the decisions of that state should be taken as controlling in this case. The decisions of the Supreme Court of Missouri to which our attention has been directed are to the effect that, where the trust fund is mingled with the property of the trustee, the owner of the trust fund is entitled to a preference upon the entire body of the trustee's estate in insolvency upon the ground that the trust fund has enhanced the estate, and thus given to the cestui que trust an equity superior to that of general creditors. The trouble in applying this proposition to the present case is that the evidence in the case, as we have already suggested, does not show that the proceeds of the goods sold by the bankrupt prior to the adjudication, which were received, but not accounted for, by it, ever came into the hands of the trustee in bankruptcy, either in their original or in some substituted form. But be this as it may, the question is not upon the construction of a contract, but upon a rule of preference in equity, and upon that question the federal decisions must control in this court, and they are all to the effect that in a case such as the one before us the preference cannot be allowed.

It follows from these conclusions that the order of the District Court must be reversed, with directions to enter an order directing that the plow company recover from the trustee in bankruptcy the property which the trustee received from the bankrupt, or the proceeds of it; that its claim for the proceeds of the property sold, but not accounted for, prior to the adjudication in bankruptcy, be allowed, and that the last-mentioned claim be permitted to participate in any dividend or dividends upon the same basis as other creditors of the bankrupt.