### In re KEARNEY.

(District Court, E. D. Pennsylvania. February 19, 1909.)

#### No. 3,139.

BANKRUPTCY (§ 164*)—VOIDABLE PREFERENCE—PAYMENT BY DEBTOR.

A payment made by a bankrupt to his brother, two days before the bankruptcy and while insolvent, in repayment of a loan, constituted a voidable preference, although the loan was made for a specific purpose and with the understanding that the money should be returned if such purpose was not carried out, as it was not, where, so far as appears, the money was not kept in a separate fund, or where it could be traced, but was used generally in the bankrupt's business, and where the creditor had reasonable cause to believe that he was insolvent when the repayment was made.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 267; Dec. Dig. § 164.*]

In Bankruptcy. On certificate of referee.

The following is the report of the referee (Richard S. Hunter, Esq.):

"John A. Kearney, a brother of the bankrupt, lent him $200 three weeks before his bankruptcy. Two days before his bankruptcy the bankrupt gave his brother a check for $233.40, being the amount of the loan, together with a balance of general indebtedness of $33.40. This latter sum is admitted to be due to the trustee in bankruptcy, but John A. Kearney claims to retain the $200 as a loan made for a specific purpose, with an agreement to return the same should that purpose be not fulfilled, and also because the insolvency of James Kearney was not known to his brother at the time of repayment to him.

"The facts in the case are as follows: James Kearney was in the retail liquor business at Thirtieth and Ludlow streets, Philadelphia, having bought the license, bar fixtures, and furniture in September, 1907, and given in part payment of the same a judgment note for $8,000. In the early part of the year 1908 an order was made upon the bankrupt for the support of his wife, and judgment was entered against him on the note above mentioned for $8,400. Soon afterwards, during March and April, 1908, the bankrupt obtained small loans from his brother to an aggregate amount of $45 or $50. The bankrupt had endeavored for some months before his bankruptcy to dispose of his license and business. He could get no advance from the brewery company which owned the real estate, but one of his creditors suggested that, if he could raise $500, the creditor might put up the balance of the $1,100 license fee, which would have to be paid on June 1, 1908. The bankrupt stated this to his brother, and his brother lent him $200 as a part of the $500, with the agreement that if, for any reason, he did not obtain the license, the $200 was to be refunded. The remainder of the money was not raised. On May 25, 1908, the bankrupt told his brother that he saw no way of getting through and that he would have to let the place go. John A. Kearney said, 'How about my money?' The bankrupt at first refused to give it to him, but afterwards gave

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

him a check for $233.40, which was all that he had in bank. On May 27th, two days afterwards, the voluntary petition was filed and an adjudication was entered. The schedules filed showed indebtedness by the bankrupt of $54 for wages, $200 for rent, and $9,728.72 to general creditors, including the $8,000 principal of the judgment of Mrs. Wintersteen. The assets of the bankrupt are valued at $75.

"It is clear from the above statement that James Kearney was insolvent at the time when he gave the check to his brother, and that the effect of that payment was to enable John A. Kearney to obtain a larger percentage of his debt than other general creditors. The claimant alleges that he did not know that his brother was insolvent; that his brother never confessed insolvency to him, and never told him of Mrs. Wintersteen's judgment. The question, however, before the referee, is whether the circumstances known to the claimant were such as to put him upon inquiry. James Kearney told his brother he did not know what was going to become of the place; that he was going to let it go. John A. Kearney knew that his brother was unable to raise the $1,100 necessary to renew his license, and that he must lose the place on the 1st of June. He knew that he was in trouble about his wife, and had lent him several sums on that account already. He was undoubtedly put upon inquiry as to his brother's financial condition, and the slightest examination into it would have revealed the existence of the Wintersteen judgment, and of the current indebtedness afterwards set forth in the schedules.

"It is argued on behalf of the claimant that the $200 was in the nature of a trust fund, and was not an ordinary indebtedness; but the fund was not earmarked and apparently not deposited in bank. The last deposit made in the bankrupt's account prior to the adjudication was on April 28, 1908, and the $200 was not lent until May 4th, or 5th. It appears to have been used to pay current expenses.

"The referee orders John A. Kearney to repay to the trustee in bankruptcy the sum of $233.40, paid by the bankrupt to him on May 25, 1908."

James B. Given, for claimant.
Charles B. Harding, for trustee.

J. B. McPHERSON, District Judge. Upon the foregoing facts, it is clear, I think, that the payment on May 25th to the bankrupt's brother was preferential. Even if it was intended, at the time when the loan was made, that the money should be used for the specific purpose of paying for the license, and, if not so used, that it should be returned, the testimony seems to show plainly that this intention was not carried out, but that the bankrupt used the money for some other purpose. No effort was made on his behalf to prove what he had done with it. He was not even asked the obvious question whether the deposit of $200 that appears in his bank book under date of April 28th was the money that he had received from his brother; and, as he must have known what became of it, his failure to say anything upon the subject is probably significant. Since, therefore, the money was not traced into a particular fund or deposit, or earmarked in any other way, the inevitable inference is that the check of May 25th was drawn against the general funds of the bankrupt, and was intended to prefer the payee. Except that the burden of proof was in the first instance on the trustee to prove the statutory elements of a preferential payment, the situation is essentially such as was presented in Plow Co. v. McDavid, 14 Am. Bankr. Rep. 653, 137 Fed. 802, 70 C. C. A. 422. See, also, Hosmer v. Jewett, Fed. Cas. No. 6,713; Re Richard, 4 Am. Bankr. Rep. 700; Loveland (3d Ed.) § 173; Collier (6th Ed.) p. 594; Brandenburg (3d Ed.) § 1187. After the trustee had established a pri-

ma facie case of preference, it then became the duty of the claimant to prove that the loan was impressed with a trust, and that the money could be followed, either with precision, or at least into a mass from which it might be extracted with reasonable certainty.

The order of the referee is affirmed.