FRELINGHUYSEN *v.* NUGENT *et al.*

(*Circuit Court, D. New Jersey.* September 25, 1888.)

1. TRUSTS—CONSTRUCTIVE—EX MALEFICIO.
   A bank cashier, who was also financial agent of the defendant, proved a defaulter for more than $2,000,000, covering his operations by charging on the bank-books drafts of defendant on a third party as sent by another bank for collection, and taking up the drafts by his own check as cashier. He testifies that he loaned the money to defendant for use in the latter's business; that defendant knew he was taking the money wrongfully; furnished blank drafts for the purpose; and kept urging him not to confess it, and assuring him that he would soon square the account. Defendant's testimony squarely denies this; also that any such sum was used in his business; which is corroborated by other proof. He testifies that he thought he was heavily in debt to the bank in the regular course of business; that he trusted the cashier as his agent, but could not get from him a statement of his account with the bank. The evidence shows that the defalcation occurred in 1873, at the time of the stock panics, and that the cashier and his brother used large sums of money, and speculated, and lost heavily. Defendant's present assets were mostly obtained on credit from other *bona fide* creditors. *Held*, that the evidence was not sufficient to establish a trust *ex maleficio* of defendant's assets in favor of the bank as against defendant's other *bona fide* creditors.

2. SAME—EQUITY—JURISDICTION—RETAINING BILL.
   The bill seeking to establish the trust was followed by a supplemental bill, praying that, if the original prayer could not be granted, defendant's assets might be divided among all the creditors, including the bank. Issue was made on this bill, and the validity of an assignment made by defendant for the benefit of all his creditors at the instigation of the complainant bank was contested by other creditors, who were made parties to the bill, thus involving in the case much litigation, which must fall with the bill. *Held* that, though the evidence failed to establish the trust, the bill should be retained for the

general benefit of all creditors who had filed their claims; that they should
be allowed to contest complainant's claim, and a *pro rata* distribution of the
assets should be decreed under the general assignment.

3. ASSIGNMENT FOR BENEFIT OF CREDITORS—VALIDITY—ESTOPPEL.
    Creditors who have voluntarily presented their claims before an assignee,
    without questioning the validity of the assignment, are thereafter estopped
    from disputing its validity, although the assignment was made at the instance
    or in behalf of one of the creditors.

In Equity.    Bill to establish a trust.    On final hearing.

This was a bill for an injunction, and to establish a trust *ex maleficio*,
brought by Frederick Frelinghuysen, as receiver of the Mechanics' Na-
tional Bank of Newark, against Christopher Nugent and James Nugent,
partners under the firm name of C. Nugent & Co., George B. Jenkinson,
receiver and assignee, Eugene Kelly and others.

*A. Q. Keasbey* and *J. Emery,* for complainant.

*J. W. Taylor,* for respondent Jenkinson.

*T. N. McCarter,* for respondents Kelly and others.

BRADLEY, Justice.    On Monday, the 31st day of October, 1881, the
Mechanics' National Bank of Newark, an old and reputedly strong and
wealthy institution, closed its doors, and announced itself bankrupt.
Perhaps no single event had ever occurred in that city which so com-
pletely shocked and astounded its inhabitants.    By his own confession,
made to the directors on the day previous, the catastrophe was caused by
the delinquency of Oscar L. Baldwin, the cashier.    His story was that
he had used the bank's money to carry along a firm of morocco manu-
facturers by the name of C. Nugent & Co., consisting of Christopher Nu-
gent and his brother, James Nugent; and that the means by which he
had kept the transactions concealed were a series of fictitious charges
against the Mechanics' National Bank of New York, the correspondent
of the Newark bank in the latter city, by which, according to the books
of the Newark bank, the New York institution was in debt to it in the
gross sum of over $1,900,000, while in truth and in fact the Newark
bank owed the New York bank over $270,000, which was shown by the
books of the latter; the discrepancy being nearly or quite $2,200,000.
This was the proximate amount of deficiency found to exist in the funds
of the bank.    The whole capital (which was $500,000) and the surplus
were entirely swamped, the assets were insufficient to pay the deposits
and other debts of the bank, and the deficiency had to be made up by
the directors and stockholders.    The institution was completely wiped
out of existence.    The cashier, who had held his office for 18 years, and
occupied an eminent position in the city of Newark as a financier, either
for the purpose of diverting to some extent the odium and execrations
which he knew would fall upon his head, or because his story was the
true one, endeavored to lay the inciting cause of the defalcation at the
door of C. Nugent & Co., and especially of Christopher Nugent, the sen-
ior partner of the firm.    His statement is substantially this:    That about
1872, Nugent & Co., who had been large dealers with the bank, became

embarrassed, and wanted him (Baldwin) to get them more money to use in their business than the directors of the bank would give them by regular discount; their line of discount being then about $75,000. Being overpersuaded by Christopher Nugent, and relying on his promise to secure the bank by a conveyance of their property in case of disaster, he lent the firm, on their own paper alone, on behalf of the bank, considerable sums, amounting in 1872 to about $142,000, without reporting the loans to the directors,—a step which it was necessary to conceal, and which gave Nugent a power over him. The latter, availing himself of this advantage, and magnifying the profits he expected to realize from the business, and repeating his promises to secure the bank in case of disaster, induced Baldwin to continue and increase his advances, until in 1874 they amounted to more than $400,000. That he then told Nugent the thing could go on no longer; that he should tell the directors, and end his own life. Nugent implored him not to do anything of the kind; represented that his business was growing better, and that soon he would control the matter, and be able to pay all his debts. Baldwin yielded, and renewed his endeavors to carry the firm along, involving further advances and extension of the business; and so year by year the debt increased until it reached over $2,000,000, under the weight of which the bank failed. During all this time Baldwin says that he met Nugent almost daily; explained to him the situation, so that he knew he was lending him the funds of the bank, and that the dread of exposure was forcing him to do it. Nugent, he says, would furnish him at the beginning of a month with a list of payments to be made, saying it was all, when frequently it did not cover half, and other checks would appear which would increase his overdrafts largely, requiring further loans. During the entire period of these irregular advances, Nugent & Co. were in the habit every day of sending to Baldwin their receipts, cash, checks, and notes, sometimes forty or fifty thousand dollars worth of paper, which Baldwin would deposit to their credit, or get discounted for their benefit; in fact, Baldwin says he practically acted as their agent in the management of their financial affairs; taking all their receipts, and paying their obligations. He says that Nugent (he generally speaks of Christopher Nugent, who represented the firm) would leave with him his drafts on Martin & Runyon, (New York brokers,) signed in blank 10 or 20 at a time, and he (Baldwin) would fill them up for whatever amounts were necessary from time to time to make their account good; and then he (Baldwin) would meet them with the funds of the bank, sometimes by check as cashier, and sometimes by cash. This diversion of the funds of the bank was concealed by charging them to the Mechanics' Bank of New York; and drafts on Martin & Runyon were sent to that bank for collection, and charged to it. So it happened that the advances thus made to Nugent & Co. became falsely charged to the New York bank, and the entire deficit in the Newark bank's assets was due to such advances; all which, according to this account, went into the concern of C. Nugent & Co., and produced the *corpus* of its assets, or at least the major part thereof.

Acting upon the faith of Baldwin's statements Frederick Frelinghuysen, the receiver of the bank appointed by the comptroller of the currency, filed the original bill in this case on the 5th of November, 1881, charging, in substance, that, by the complicity of Nugent & Co. in the embezzlement of the cashier, they became trustees *ex maleficio* of the bank's moneys, and held their entire property and assets subject to and charged with a trust for the use of the bank to the extent of said moneys in preference to the claims of any other creditors. The bill prayed an injunction against the disposal of the property, and application was also made for the appointment of a receiver to take charge of it for the benefit of all parties interested therein under the order and direction of the court, and an injunction was granted, and George B. Jenkinson was appointed receiver, and as such took possession of the whole property and assets, both of the firm of C. Nugent & Co. and of the individual partners, as completely as if the parties had been declared bankrupt, and he had been appointed the assignee. This was certainly, in the language of the medical profession, very heroic treatment; and, if Baldwin's representations were true, (and he verified them by oath,) the course pursued was probably justified by the circumstances. A whole community had been shocked and thrown into financial disturbance, if not actual panic, by the enormity of the delinquencies disclosed; and there was naturally a demand for severe measures, and a rigid execution of the law. Baldwin, of course, was subjected to criminal prosecution, and criminal proceedings were also commenced against Christopher Nugent. But there were other interests involved besides those of the bank. Nugent & Co. were indebted to a large amount—somewhere about $375,000—for materials and other things used in and about their business, and a large number of their creditors immediately commenced suit against them, or threatened to do so. The Nugents denied the allegations of Baldwin as to any complicity with him in embezzling or improperly using the funds of the bank, and denied that they had any knowledge or notice that he made loans to them on account of the bank without due authority. Their counsel prepared an answer to the bill of complaint in this case, and the Nugents swore to it on the 21st day of November, 1881, in which all the charges made by Baldwin and by the bill of any such complicity or knowledge were squarely and fully met and denied. They also denied that they had obtained through Baldwin's means any such amount of money or loans as he pretended they had. They admitted that Baldwin had acted as their financial agent for several years past, ever since they were first embarrassed in 1872 or 1873; that they turned over to him daily all their receipts, and he paid their obligations as they became due. They state that this mode of transacting their business was done at his request; and they admit that they gave him drafts signed in blank to use for them in case of necessity during the absence of Christopher Nugent, who was the principal business manager of the firm, but they never knew that he made any such irregular use of them as he pretends in his statement. They state that their bank-account was always kept good, or, if temporarily deficient, they always made immediate arrangements for making

it good; but that for the last few years they had been unable to know exactly what the account was, except as Baldwin informed them, inasmuch as they could get from him no pass-book or statement; that they had not had a pass-book since early in 1879; that once a week they sent Baldwin a list of the assets turned in to him during the week past, and once a month furnished him with a list of their obligations coming due for the month; but they were much embarrassed for want of an accurate statement and account from him as to the condition of their accounts in his hands, and often applied to him for such a statement, which he would promise to give them, but never did. It was stated in the bill of complaint, founded on suggestions of Baldwin, as a reason for the absorption of such a large amount of money as it was charged that the Nugents had received through him, that they had speculated largely in goat skins, in order to have control of the market, and had lost large amounts by such transactions; also that they had gone to great expense in enlarging their factory and machinery, and had spent hundreds of thousands of dollars in extravagant outlays which were of no practical advantage. They denied these charges *in toto;* stated that they had never bought skins except for the purposes of their manufacture, and had always bought at reasonable prices; and, as to their plant of buildings and machinery, they stated that these had not been increased since 1873 beyond the wants of their business, and not to exceed some $20,000 or $30,000 in amount. It may be added here that these statements about their business and their purchases of skins, and about their buildings and machinery, were all corroborated by the testimony subsequently taken in the case. As before said, this answer of the Nugents was sworn to on the 21st of November, 1881; but on the 22d of the same month, before it was filed, an interview was had between them and their counsel and the counsel of the complainant, who was also district attorney of the United States, representing the government, perhaps, in a way, in the civil as well as in the criminal proceedings, and it was agreed that Nugent & Co. should withdraw opposition to the application for an injunction and the appointment of a receiver, they having the naming of the receiver; and that the criminal proceedings against Christopher Nugent, which had been carried to the extent of his being held to bail in $25,000, and of certain testimony being taken, should be stopped. This, from the evidence taken together, I understand to have been the main arrangement. It was stipulated then or subsequently that the Nugents might be employed by the receiver to conduct and carry on the business of manufacture for the purpose of working up the unfinished stock, and that they should continue for the present to occupy and use their dwelling-houses and furniture. In pursuance of the agreement thus entered into, an order for an injunction and the appointment of a receiver was made by the court on the 26th of November, 1881, which order commenced as follows:

"An order having been granted on the filing of the bill of complaint in this cause, requiring the defendants to show cause why an injunction should not issue in pursuance of the prayer of said bill, and why a receiver should not be appointed, and the court having on the day fixed for the argument of the

said rule postponed the hearing of the same until the 1st day of December next, and the court being now advised by the written consent of the solicitors of the defendants that it has been agreed between the counsel of the respective parties that an injunction may issue in pursuance of the prayer of the bill, and that George B. Jenkinson may be appointed receiver upon giving proper bonds, without further argument upon said rule to show cause, it is therefore, on this 26th day of November, 1881, hereby ordered and decreed that a writ of injunction do issue out of this court, etc., and that the said George B. Jenkinson be and he is hereby appointed the receiver of all the real estate and personal property, assets and choses in action of every description, whether held or owned by them as partners, or by either of them individually, with full power, as soon as his bond shall be approved and filed as hereinafter directed, to take immediate possession and control of said real estate and personal property and assets, and to hold and dispose of the same for the benefit of all parties interested therein, under the order and direction of the court."

The order went on to give directions to the receiver as to the management of the property; among other things, authorizing him, if he should think it desirable, to retain and employ the Nugents in the practical working of said business and manufacture, and to allow them to use and occupy their dwelling-houses and furniture, until the further order of the court. Jenkinson, it seems, was a friend of the Nugents, and was one of Christopher's bondsmen in the criminal proceedings which had been instituted against him. From this period the Nugents for some time seemed to be favorably disposed to the complainant and his case, whereas up to this time they had expressed much interest for their other creditors, and a desire to aid them in getting satisfaction of their demands. There is no doubt that they were hopelessly insolvent anyway, and it was really a matter of little interest to them what destination their property took. Their real estate was all covered by mortgages, which by subsequent foreclosure absorbed the whole of it, though undoubtedly at some sacrifice of value, as is usual in such cases. Their entire personal property and assets have netted less than $200,000, which is still in the hands of the receiver, awaiting the decision in this case. The litigation in this suit subsequently became more complicated. The creditors of Nugent & Co. were pushing their suits against the firm with all speed, and it was evident that if they should get judgments they would have power to bring the claims of the complainant and the validity of his proceedings directly in question. Whether to obviate such an exigency, or to provide a way for the representative of the bank to come in against the proceeds of the property on an equal footing with the other creditors in case the bill should not be sustained, the Nugents, on the 14th of December, 1881, made an assignment of all their property, partnership and individual, to Jenkinson, the receiver already appointed by the court. It is reasonably apparent that this move was made at the instance of the complainant, or in his behalf. An order prepared by his counsel was made the day before the assignment in the following terms, to-wit:

"Application being made on behalf of the defendants to this case, representing that they desire to make a general assignment to the receiver appointed in this cause for the equal benefit of their creditors, under the state laws, to the end that any of the property of the defendants placed in the hands of the

receiver under the order of the court made in this cause on the 26th day of November, 1881, with consent of defendants, which may not be decreed to belong to the complainants, or held in trust for him as receiver, as claimed in his bill, may be equally distributed among all their creditors, and praying that they may be permitted to make such assignment without being held to violate the injunction granted in this case; and such proceeding appearing to the court to be just and equitable, it is ordered and decreed that such assignment by the defendants will not be decreed a breach of such injunction."

The assignment was made accordingly, professedly for the equal benefit of all creditors. The counsel for the complainant, in an affidavit made by him on the 25th of March, 1882, states that this assignment was made in order to secure absolute equality among all creditors in any property which the court might declare to be free from the paramount equitable lien of the receiver of the bank, and that Jenkinson was selected as assignee in order to save the complication that might possibly arise from the appointment of another party. He further states, in the same affidavit, that the whole object of the transaction was to submit to the court, in the fullest way possible, the question whether the receiver of the bank, under the circumstances of the case, had an equitable lien upon the property, and to secure the equal distribution of the property among all the creditors in case such equitable lien should be denied; an object which, as the counsel continued to say, "from its intrinsic fairness, he, as well as the counsel of the firm, supposed would meet with the approval of all persons interested in the property." There can be no doubt, from this statement and other evidence in the case, that the assignment was by the procurement and at the instance of the complainant, or in his behalf, whatever, if anything, may be the effect of this fact, in the consideration of particular aspects of the case. On the 10th of January, 1882, the defendants Christopher and James Nugent filed an answer to the bill of complaint, not signed by them nor sworn to, and quite different from the answer previously sworn to, but still denying all complicity with, or knowledge of, any irregular transactions of Baldwin, the cashier. This answer can have very little effect in the case, as it was evidently intended to carry out the arrangement made on the 22d of November. On the same 10th of January, 1882, the defendants Eugene Kelly & Co. recovered judgment against the Nugents for the sum of $29,494, and on the 7th of February application was made on behalf of said Kelly & Co., and other creditors of Nugent & Co., to have Jenkinson, the assignee, and said creditors made parties to the suit, in order that they might assert their rights and claims as creditors to participate in the distribution of the assets of Nugent & Co. This application was not granted, but at the suggestion of the court the bill of complaint was amended by making Jenkinson, as assignee, a defendant to the suit, and the counsel representing the said creditors was allowed to prepare and file an answer in the name of Jenkinson, setting up substantially the same defense to the bill which had been set up by the Nugents in their first answer, which was sworn to. The counsel for the creditors then, on the 6th of March, 1882, called Christopher Nugent before a commissioner to be examined; but his counsel appeared with him, and objected to any answers being given

by him relating to his business connection with Baldwin, lest it should tend to criminate him. Nugent complied with the suggestions of his counsel, and the examination accomplished nothing. On the next day the assignee, Jenkinson, procured an order from the court, allowing him to withdraw the answer filed in his name. The creditors Kelly & Co. then petitioned for leave to file an original bill on their own behalf, in order that they might litigate the claims of the complainant to the property of the Nugents. This application was denied, but the court made an order on the 30th day of March, 1882, that, for the purpose of enabling it to determine all questions relating to the disposition of the funds in the hands of the receiver between the petitioners and all other persons claiming the same, the complainant should make the petitioners parties to the cause by supplemental bill, and that the petitioners, upon filing answer in the cause, should have leave to file a cross-bill. Such supplemental bill was filed, making Eugene Kelly & Co., in addition to the Nugents and Jenkinson, the receiver, parties defendant. Kelly & Co. filed an answer and a cross-bill. In the former they again set up substantially the same defense which had been originally made by the Nugents in their sworn answer; and in their cross-bill they set out all the circumstances and the whole history of the case, and claimed that there was not only no trust arising *ex maleficio* in favor of the bank on the property of the Nugents, but that the assignment was intended to hinder and delay the creditors of Nugent, and was therefore fraudulent and void.

In August, 1887, Christopher Nugent was again put under examination; this time without being attended by counsel, and apparently not disposed to conceal or hold back any facts relating to the matters in litigation. He was under no further fear of criminal proceedings, since the statute of limitations had now rendered him exempt from prosecution. He was examined and cross-examined in great detail, and, as he had done in his original answer, he entirely contradicted Baldwin's statements as to any unlawful or irregular use of the moneys of the bank with his consent or knowledge. Many of the side issues which had been raised with regard to his business transactions—his alleged speculation in hides, large expenditures in buildings and machinery, great losses in trade, etc.,— were brought to his attention, and refuted and explained by him in an entirely satisfactory manner; and in nearly all that he testified to on these subjects he was fully corroborated by other witnesses. It is impracticable to go over the evidence in detail. It has been carefully read and examined, together with the evidence of Baldwin and that of Lewis, the expert accountant, who has stated what is to be gathered from the books of the Mechanics' Bank of Newark, the Mechanics' Bank of New York and the drafts, checks, notes, and documents in their possession; and the conclusion to which I have come is that the main question,— whether the funds of the Newark bank were unlawfully and clandestinely used in the business of the Nugents with their complicity or knowledge, —the question on the affirmative to which the original bill of complaint in this case was founded, depends at last on the relative credit to be given to Baldwin and Nugent. If Baldwin's story is true, the affirmative is

made out. If Nugent's is true, the affirmative is not made out, and the bill in its original aspect cannot stand. And on this main issue the books and papers of the bank, examined by the expert, furnish no satisfactory corroboration of Baldwin's statements. They may show a large indebtedness of the Nugents to the bank,—an indebtedness for which they are bound in consequence of reposing so much confidence in Baldwin, and allowing him the use of their name and funds,—but they do not and cannot show that the Nugents were implicated with Baldwin, by knowledge, consent, or otherwise, in any unlawful use of the funds of the bank. Baldwin says he repeatedly told Nugent the unfaithful course he was pursuing. Nugent flatly denies this. Baldwin says he told him so in the presence of two friends, McGregor and Reynolds. McGregor peremptorily denies it, and so, in fact, does Reynolds, though he once signed a paper to be used by Baldwin's counsel to obtain a mitigation of his sentence, in which he did say that something of the kind was said at the interview referred to; but it is so different from the story that Baldwin tells that we must believe in his (Reynolds') sworn testimony, rather than in the paper. Baldwin says that on one occasion he sent Nugent to New York with a dispatch to be sent from there, as coming from an officer of the Mechanics' Bank of New York, to deceive the public bank examiner as to the balance of accounts between the two banks. Nugent says he never went on any such errand. He does recollect that Baldwin once came to the factory, and wanted him to send a boy to New York with a letter to be mailed there, and he sent him; but what was in the letter he did not know, but understood that Baldwin wanted it to go as speedily as possible to Boston, which would be effected by its being mailed in New York, rather than in Newark. And so to the end of the chapter.

The case made by the bill, then, stands on the testimony of these two men. Which of them are we to believe? Or, if their contradictory testimony leaves the question in doubt, how is the doubt to be decided? Surely the complainant is bound to make out his case. He should make it out, not only by preponderance of proof, but by a very clear preponderance. The claim is of the whole property and assets of the firm of C. Nugent & Co., and of the individual partners. It is anomalous and startling. It should be supported by the strongest proof. Other parties, having nothing to do with the alleged transactions, suffer by it. Here are *bona fide* creditors, whose claims amount to nearly $375,000, who have given credit to Nugent & Co., on the faith of their being in possession as reputed owners of a large factory, stock, and assets. If this is all swept away before their eyes by the claim of equitable ownership on the part of the bank, it is a case of great hardship, of which they have good right to complain, unless the soundest reasons exist for such an interposition. It has for ages been a rule of the English bankrupt law that possession with reputed ownership renders property liable for the debts of the possessor to those who have given him credit on the faith of it. The principle of that law is just. We have no such law in terms, but, wherever the case occurs, equity will favor the application of the

principle. It adopts it fully in favor of *bona fide* purchasers against those claiming the benefit of a secret trust. The principle referred to should at least be so far regarded in a case like the present as to require the party claiming the benefit of the trust to make very clear and satisfactory proof of his right to make such claim.

On the question of credibility as between the two witnesses, it seems to me that the preponderance of circumstances is greatly in favor of Nugent. There was nothing in the character of the firm's business, or in their mode of carrying it on, or in the habits of the men, to account for such a large dissipation of funds as that which is charged against them, in addition to the legitimate debts which it is conceded they owe. They seemed utterly aghast at the charge. They knew that they were largely in debt to *bona fide* creditors; they knew that they were owing the bank a considerable amount, contracted in the usual course of business; they knew that their paper was held by several directors of the bank, negotiated by Baldwin for their use; but that they had been drawing and using the bank's money in an irregular way till the amount rose to $2,000,000 was utterly beyond their comprehension or belief. It is difficult to believe that any such sum was ever used by them or on their account. Where, then, did the money go? It must have gone somewhere. We are at no loss to see where it might have gone when we are informed, as we are by the testimony, and by the charges made by the complainant in a bill filed by him against Baldwin and his brother, that Baldwin's personal use of moneys was very large. He was intrusted (such is the allegation of the complainant) with almost the sole management and control of the financial affairs of the bank, by which he was enabled at his own will so to manipulate the accounts and to control the disposition of its funds as to permit him to apply such funds to any use and purpose he might desire, and to use the same for his own purposes; and his personal accounts with the bank show very large transactions, amounting in one year to over $2,000,000, and on an average, since the year 1871, to about $500,000 a year. The complainant adds that he had been unable to verify the statement of the cashier that the entire misapplication and abstraction of the funds of the bank had been for the benefit of the said firm of C. Nugent & Co.; but he had reason to believe that very large sums, funds of the bank, had been from time to time fraudulently embezzled and misapplied by Baldwin, and used for his own purposes, in the purchase of stocks, in loans to individuals, and in other speculations. It also appears that Theodore Baldwin, the brother of the cashier, who was first teller of the bank, had the handling of the cash of the bank, and became owner of a large amount of real estate; and that he dealt largely in stocks, and met with some heavy losses; and that, on one occasion, he delivered to his brokers in New York $40,000 in bank-bills. Yet the said Theodore had only a salary of $3,500. It was shown that he was cognizant of the abstraction of the bank's money by his brother, and made many false entries in the books of the bank to cover up those irregular transactions. With such opportunities to obtain money and to dispose of it, there is no great difficulty in conceiving how the funds of the bank were probably employed.

Nor is it difficult to understand that the manipulation and management of the finances of such a large manufacturing concern as that of Nugent & Co., somewhat straitened, and compelled to borrow money both from the bank and from private parties, presented to the cashier a convenient means of carrying on operations which he might desire to conceal. It is significant that the offer to manage the financial affairs of the firm took place in 1873, a year noted for stringency in the stock speculating world. It is not at all improbable that some of Baldwin's ventures may have been unfavorable at or before that time, and that the unlimited use and control of the name and securities of the Nugents may have presented itself to him as a convenient means of facilitating his own operations. There is no direct proof of Baldwin's gambling in stocks. He himself denies it, and endeavors to throw the procuring cause of his delinquencies on Nugent. His denial is not entitled to much weight after his admission of having committed so many guilty acts as he was obliged to do in order to verify the false periodical reports of the bank's condition, and to deceive the bank examiners; and it is not to be wondered at that after the bank's failure any brokers with whom he may have transacted business would desire to keep in the background, and not allow his operations with them to be known. Looking over the entire case, only a small part of which has been adverted to, I feel obliged to say that I cannot believe Baldwin's story that the $2,000,000 which disappeared went into the Nugents' concern. Much less can I believe that they were cognizant of or implicated in any such abstraction. Nugent's testimony, on the other hand, seems to me to be generally entitled to credit. It accords better with the probabilities of the case than the statements made by Baldwin. In my judgment, therefore, the main ground of the bill is not supported by the proofs.

Another difficulty in the complainant's case is the want of identity of the property claimed with the proceeds of the money abstracted from the bank. Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it, depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried. The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed,—that is to say, the stock on hand, finished and unfinished,—were either in whole or in part the proceeds of any money unlawfully abstracted from the bank. On the contrary, the goods and stock on hand were purchased of the other creditors of Nugent & Co. almost entirely, if not wholly, on credit, and really stand in the place of,

and represents the debts of, the firm due and owing to said creditors. This is true with regard to all the raw stock on hand, and with regard to all the stock and materials from which the manufactured or partially manufactured goods were produced. If any moneys derived from the bank entered into the latter, they were those moneys which were regularly drawn by checks of the firm weekly for the payment of their hands. It seems impossible, therefore, to sustain any such general charge or trust upon the goods and property of Nugent & Co. as that which has been set up and claimed by the complainant.

The question then arises whether the bill may be retained for the purpose of disposing of the general equities of the case as between the parties. There are the assignment, and the cross-bill, which seeks to set it aside, and to have the fund in court applied to the payment of the judgments of Eugene Kelly & Co., and the other creditors who have obtained judgments. If the bill is absolutely dismissed, the entire litigation respecting the assignment goes for nothing, and the parties must begin over again. This is a result not to be reached, if it is possible to avoid it. It seems to me that the bill may be retained. The complainant, in his supplemental bill filed in pursuance of the order of March 30, 1882, prayed in the alternative that, if the prayer of his original bill should not be granted, the property of Nugent & Co., or the proceeds thereof in the hands of the assignee, might be distributed equally among all their creditors, including the complainant himself, as receiver of the bank. Issue was made on this bill, and the defendants, by their cross-bill, raised the question of the validity of the assignment. The whole case, therefore, is before the court. I will state shortly the conclusions to which I have come on these supplemental issues, without going at large into the reasons of them:

*First.* I think that the assignment, notwithstanding it may have been made at the instance of the complainant, or in his behalf, cannot be set aside as fraudulent and void, and intended to delay and hinder the creditors of Nugent & Co. It is intended for the benefit of all the creditors; and the ordinary creditors of the firm, or nearly all of them, have voluntarily presented their claims before the assignee, without any protest as to the validity of the assignment. This estops them from making objections to its validity.

*Secondly.* I think that the judgment creditors must come in *pro rata* with the creditors at large. The *status* of the parties in relation to each other is that which it was when the assignment was made.

*Thirdly.* I think that the court having possession of the fund may administer the estate under the assignment in accordance with the state law. It is only necessary that the rights of the parties should be preserved substantially as secured to them by that law. One of these rights is that of contesting the validity of claims presented for allowance. The other creditors of Nugent & Co., who have regularly presented their claims, and have filed exceptions as provided by law, should have the opportunity of contesting the claim of the bank, if they see fit to do so. This right has been substantially accorded to Eugene Kelly & Co. by their be-

ing made parties in the cause, and defending the same. They have filed an answer and cross-bill, and taken testimony as fully as they desired. The result is before the court in the extended record of the case. It is not probable that any further light could be shed upon the questions involved. But as I am informed that one of the other creditors, who duly presented his claim to the assignee, did file exceptions to the claim of the complainant within the time prescribed by law, provision should be made in the decree for opportunity to him to adduce evidence in support of said exceptions. As the case is on the equity side of the court, a jury trial is not necessary. I am not satisfied from the evidence produced that the complainant is entitled to a judgment against Nugent & Co. for the full sum which has been claimed under the assignment, which amounts to $2,191,902.69. This includes over $900,000 which were never credited to Nugent & Co., and from which there is no evidence, except the general allegations of Baldwin, that they ever received a dollar of benefit. The common case was simply this: On a certain date a draft of Nugent & Co. on Martin & Runyon would be charged on the books of the Newark bank to the Mechanics' Bank of New York, as being sent to it for collection. That draft would either be replaced before reaching the New York bank, or would be taken up after it had reached it, by a check of Baldwin as cashier; thus using or appropriating so much of the Newark bank's funds. Some of these drafts on Martin & Runyon were found in a tin box of Baldwin's, found in the vault of the bank. Now, Nugent & Co. did not derive the benefit of a dollar from this transaction. It was simply a device of Baldwin's to increase the apparent account of the Newark bank against the New York bank, evidently done to cover up some embezzlement of the bank funds which had previously taken place. The bank lost nothing and gained nothing by the transaction effected by means of the draft. It got an increased credit with the New York bank, which was balanced by its funds checked out by Baldwin, or taken in the shape of bank-bills to meet or replace the draft. Nugent & Co. had nothing to do with it in any way, except as Baldwin used one of their blank drafts as an instrumentality in raising the apparent credit of the bank against its New York correspondent. He might have used any other piece of paper in the same way, for the like purpose. As to that part of the account put in by the complainant which went to the credit of the Nugents, amounting to $1,014,750.17, it seems to me that, whether they received the benefit of the money or not, they are bound for it. The authority given by them to Baldwin to manage their financial affairs would, I think, be sufficient to make them legally liable for this amount.

This is the general result to which I have come, after quite a careful examination of the case. It is unnecessary, and almost impracticable, to exhibit in an opinion all the grounds and reasons which have led to it. The conclusion is that there must be a decree to dismiss the bill of complaint so far as it prays for the establishment of a trust *ex maleficio* against the property or assets of the firm of C. Nugent & Co., or of the individual partners of said firm; and also to dismiss the cross-bill so far

as it seeks to have the respective deeds of assignment executed by Christopher and James Nugent as partners and as individuals declared fraudulent and void, and to have the claim of the complainant entirely disallowed.   Also to declare the said deeds of assignment to be valid and operative, and to establish and allow, under said assignments, the claim of the complainant as a creditor of said Christopher and James Nugent to the amount of $1,014,750.17, and the claims of the other creditors to the several amounts set up and duly verified by them respectively.   And the decree should further provide that the fund remaining in the hands of the receiver and assignee, George B. Jenkinson, after payment of costs and expenses, be distributed among said creditors *pro rata* according to the amount of their several claims as above stated.   The complainant will be decreed to pay the costs of both parties up to the time of filing the cross-bill.   The counsel will prepare a decree in accordance with this opinion.