BOARD OF COM'RS OF CRAWFORD COUNTY, OHIO, v. PATTERSON.

(Circuit Court, N. D. Ohio, E. D. November 9, 1906.)

No. 6,736.

1. TRUSTS—MINGLING OF FUNDS BY TRUSTEE—RIGHT OF BENEFICIARY TO FOLLOW PROCEEDS.

When a trust fund is mingled with other funds of the trustee, and the whole is invested in assets which come into the hands of a receiver, a trust will be declared in favor of the beneficiary, and a preference given in such assets.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 47, Trusts, §§ 520–525.]

2. SAME.

The cashier of a national bank in Ohio, at the time it went into the hands of a receiver in insolvency, was a deputy county treasurer, and for about three months previously had been collecting taxes at the bank; the money so collected being mingled with the funds of the bank, and the amounts credited to an account kept in the name of the county treasurer. Neither of such officers had power under the state law to deposit money so collected or to part with title thereto. Of the funds of the bank with which such taxes were mingled, a portion remained during all of such time in the bank and came into the hands of the receiver, and the remainder was used in its general business, being invested in loans and securities, a part of which came into the hands of the receiver and were collected by him. Held, that the county was entitled to recover from the receiver, as a trust fund, an amount of the cash taken possession of by him equal to the lowest cash balance remaining in the bank at any time during the time the collections were being made, which was presumably a part of the trust fund not used, and also the proceeds of all loans collected by the receiver and made during such time from funds with which the taxes collected had been mingled.

In Equity.

Finley & Gallinger and Ford, Snyder & Tilden, for complainant.

W. J. Geer, Smith W. Bennett, Booth, Keating & Peters, and Cushing & Clarke, for defendant.

TAYLER, District Judge. On the morning of February 15, 1904, the Galion National Bank, of Galion, Crawford county, Ohio, being insolvent, closed its doors, and thereupon its assets went into the possession of a receiver appointed by the Comptroller of the Currency. The books of the bank, on the day of its failure, showed a credit balance of $48,289.17 in favor of the treasurer of Crawford county, arising from taxes collected by the cashier of the bank, who had been appointed a deputy treasurer of the county. The bill in this case prays that the amount of money thus collected for the county, and turned into, and mingled with, the funds of the bank, and invested in its assets, be declared a trust fund, having a lien against the assets of the bank prior to the general creditors thereof.

In so far as the facts essential to the determination of the rights of the parties are concerned, there is no contest. For many years prior to 1904, it had been the custom of the county treasurer of Crawford county to authorize some official of the Galion National Bank to collect the taxes charged against citizens of the city of Galion, and of Polk township, in which Galion is situated. To conveniently carry out the object of this arrangement, the treasurer supplied the officer of the bank, thus deputized to collect the taxes, with forms of receipts issued by the county treasurer, and with a certified copy of the duplicate showing the amount of taxes charged against each individual. The money received for taxes thus collected was disposed of precisely as other funds passing over the counter of the bank were handled; that is to say, the proceeds of checks, as well as the currency paid in for taxes, were mingled with the funds of the bank, and never afterwards were capable of identification. So far as the account kept with the treasurer was concerned, it was exactly similar to the accounts which it kept with depositors; that is to say, there was an individual ledger account, as with a depositor, headed "County Treasurer, Tax Account," and on these sheets were entered the several items—deposits, balance, and checks. Ordinarily, the amount thus collected for taxes was paid to the county treasurer near the day on which it is the duty of the county treasurer to settle with the county auditor—approximately the 1st of March and the 1st of September—by cashing drafts made by the county auditor on the county treasurer for the benefit of the treasurer of the city of Galion, or of the Galion school district, or of the township of Polk, and the remainder of the amount, not thus paid out, was turned over to the county treasurer in currency; that sum being usually carried to Bucyrus, the county seat, a distance of about 12 miles.

Some time in 1902, L. W. Blyth, cashier of the Galion National Bank, was appointed by the treasurer of Crawford county as deputy to collect the taxes for the city of Galion, for the Galion Union school district, and for Polk township. For the faithful performance of his duties in this regard, he executed a bond, which was signed, as sureties, by officers and directors of the bank. Prior to the collection of the taxes due in December, 1903, Blyth, as cashier and deputy treasurer, had settled with the county treasurer for all of the taxes previous to that time collected; so that, at the time the bank failed, there was no obligation on its part, or of the deputy, to the county treasurer, except for the taxes which were collected on account of the taxes due in December, 1903. These collections commenced to be made, as shown by the books of the bank, on the 8th of October, on which day $225.96 was paid. Taxes continued to be paid slowly and in small sums, so that, by December 1st, something over $6,000 had been collected. During December, payments were much more rapid; the whole amount collected up to December 31st being $40,686.73. Between that time and the 2d day of February, the last day on which taxes were paid in, about $7,500 additional was collected.

When the bank closed its doors, it had in its vaults, in cash, $20,-274.01. The lowest point to which the cash on hand had fallen subsequent to the time when the bulk of the taxes were collected was $11,-

652.25, on February 1st. After February 1st, $45.36 was collected for taxes; so that hereafter, in dealing with the subject of the lowest amount of cash remaining on hand after the collections were made, the $45.36 will be added to the $11,652.25, making the lowest amount remaining on deposit $11,697.61. Suitable demand was made by the commissioners of the county, whose duty it is to act in that regard, upon the receiver of the bank, for the payment of the full amount of the taxes which the bank had received. Such other facts as are material will be referred to in the course of the opinion.

1. The first question to be considered is as to the nature of the relation which arose between the bank and the treasurer of the county by reason of the collection of the taxes and the deposit of the money to the credit of the treasurer.

Without referring in detail to the several statutes of Ohio which bear upon this subject, it is enough to say that the funds were public funds, and that, neither by contract nor estoppel, could they become possessed of any other character. The treasurer, under the law, had no right to deposit them; and neither the treasurer nor the county commissioners could, by knowledge of the method of dealing with the fund, or by consenting to the same, change the character of the fund or the rights of the county. The cashier of the bank, as deputy, was the treasurer of the county as to the particular taxes which he collected. The fund was, and always remained, a trust fund, and, as such, was rightfully subject to the application of every rule which exists in favor of its preservation.

2. Such being the character of the fund, what are the rights of the parties?

It is contended by the complainant (1) that, under the so-called rule of good conduct, and the legal presumption arising therefrom, so much of the funds of the bank as its officers permitted to remain in its vaults after the taxes were paid in must be recognized as the funds of the county, and that therefore the lowest amount on deposit after the funds had accumulated must be decreed to belong to the trust; (2) that, as to the residue of the fund, it swelled, pro tanto, the assets of the bank, and therefore impressed upon the remaining assets of the bank a trust; (3) that, as the bank, during the period in which the deposits were made, invested the mingled mass in various bills, notes, and other securities, the residue of the fund, after allowance for the amount that remained on deposit, must be charged against the proceeds of the loans made from the funds of which the public funds formed a part.

The general rules of law applicable to cases of this character may be said to be definitely established in this country. Much difficulty is encountered in the application of the facts of any particular case to these rules, but I think that an analysis of the conditions here will resolve any difficulties which present themselves.

The rule, as laid down by Mr. Justice Bradley, in the case of Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, is as follows:

"Formerly, the equitable right of following misapplied money or other property into the hands of parties receiving it depended upon the ability of iden-

tifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it, by exchange, purchase, or sale; but, if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor."

This doctrine is also declared by the Supreme Court of the United States, in the case of Bank v. Life Insurance Company, 104 U. S. 54, 26 L. Ed. 693, as follows:

"That, so long as trust property can be traced and followed into other property into which it has been converted, the latter remains subject to the trust; and that, if a man mixes trust funds with his own, the whole will be treated as the trust property, except so far as he may be able to distinguish what is his own—are established doctrines of equity in every case of a trust relation, and to moneys deposited in a bank account and the debt thereby created, as well as to every other description of property."

The rule declared in Frelinghuysen v. Nugent, supra, is quoted with approval by Mr. Chief Justice Fuller, in the case of Peters v. Bain, 133 U. S. 670, 10 Sup. Ct. 354, 33 L. Ed. 696. In that case, the court held:

"The individual partners in a private bank were also directors in a national bank, and, by reason of their position, became possessed of a large part of the means of the national bank which they used in their own business. They assigned all their property to trustees for the benefit of their creditors. The national bank also suspended, and went into the hands of a receiver. *Held*, that the receiver was entitled to the surrender of such of the property as had been actually purchased with the moneys of the bank as he might elect; but that purchases made and paid for out of the general mass could not be claimed by the receiver, unless it could be shown that moneys of the bank in the general fund at the time of the purchase were appropriated for that purpose."

This rule is amplified, also, to the effect that, if the trustee has mingled a trust property with his own, he will be deemed to have used his own rather than the trust property, and so to leave the remainder under the trust; and that is sufficient identification for the owner. And so, as stated in another form, when a trustee wrongfully commingles trust money with his own, and makes payments from the common fund, it will be presumed that he paid out his own money, and not the trust money. Standard Oil Co. v. Hawkins, 74 Fed. 395, 20 C. C. A. 468, 33 L. R. A. 739; State v. Bank, 54 Neb. 725, 75 N. W. 28.

We discover, therefore, that, in the first place, identification of a trust fund is complete, where moneys are found in the hands of the trustee who has mingled his own funds with the trust fund, and that the remaining fund, if not in excess of the trust fund, will be deemed to be that portion of the trust fund which the trustee has not touched, because belonging to the trust; and, in the second place, that, if the trust fund has been mingled with the body of the trustee's estate, and the trust fund, or any part of it, has been converted into other specific forms of property which can be discovered and followed, and which passed into the hands of the assignee, receiver, or trustee, that property will be turned over to the beneficiary of the trust, or, if the trust fund has

been mingled with the funds of the trustee, and has been invested, along with trust funds, in assets which have come into the hands of the receiver or assignee, then the trust fund is made a charge against the entire mass of the assets in the acquisition of which the trust fund, together with the other property of the trustee, was used.

Bearing constantly in mind the nature of the fund, and the fact that it could not, by any agreement or otherwise, become a "deposit" in the sense in which that term is used in banking, and that the relation of debtor and creditor could not exist, we must differentiate this case from those in which the parties to the transaction were a bank on the one hand, and, on the other hand, an individual who, whether rightfully so doing or not, yet had the power to contract with the bank and make deposits with it, we find light thrown upon our inquiry by the language of Mr. Justice Miller, in the case of Marine Bank v. Fulton Bank, 2 Wall. 252, 17 L. Ed. 785, and quoted by Mr. Justice Brewer, in Commercial Bank of Pennsylvania v. Armstrong, 148 U. S. 50, 59, 13 Sup. Ct. 533, 535, 37 L. Ed. 363:

"All deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter; and that other kind of deposit of money peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money, and loans it to the banker. And the latter, in consideration of the loan of the money and the right to use it for his own profit, agrees to refund the same amount, or any part thereof, on demand. The case before us is not of the former class. It must be of the latter."

In this case, the depositor, if we may call him such, did not part with the title to his money. He could not part with it. The law forbade it. The case therefore falls within the first class referred to by Mr. Justice Miller, namely, into that class in which the bank becomes bailee of the depositor; the title to the thing deposited remaining with the latter.

Among other cases upon which the defendant seems to rely very largely, as far as federal authorities are concerned, is the case of Spokane County v. Clark (C. C.) 61 Fed. 538, decided in the Circuit Court for the Eastern District of Washington, in 1894, by Judge Hanford, and on the same case, decided by the Circuit Court of Appeals, 68 Fed. 979, 16 C. C. A. 81, in which the judgment of the lower court was affirmed. The lower court passed upon a demurrer to the bill, which seems to have been predicated upon the allegations of a deposit by the treasurer in the First National Bank of Spokane of certain sums of money, of which all but about $11,000 had been repaid; that the bank became insolvent, and went into the hands of a receiver; that the receiver, since his appointment, had received of the assets of the bank sufficient money and funds wherewith to pay and satisfy the balance so deposited by the county treasurer. Of course a demurrer to such a bill would have to be sustained, and the holding of the court, both originally and on appeal, is in no way inconsistent with the contention of the complainant here. There was no allegation in the bill, either (1) that the bank had on hand, at the time it went into the hands of the receiver, any cash; or (2) that the money deposited by the treasurer had, either separately or in conjunction with the other funds of the

bank, been used to purchase any securities or acquire any other property which went into the hands of the receiver. If we should eliminate those two propositions from the case that is now before us, there would be nothing of it. They are the two facts which do appear, and upon which stress is laid. And the court distinctly declares the law as just stated, in the case in the Circuit Court, on page 539 of 61 Fed.:

"Money held by a bank as trustee is not part of its assets, nor legally subject to the claims of its creditors. If the money had been kept intact as a special deposit, or if it was possible to prove that any of the complainant's money, or any securities or property acquired by the bank by investment of money with which it had been mingled, came into the receiver's hands, according to the principles of equity now firmly established, the right of the complainant to the relief prayed for would be clear; but there is no averment in the bill of complaint that the money deposited can be traced, nor that the estate which has come into the receiver's hands includes securities or property of the bank acquired since receiving said deposit. It does not appear that any of said money was invested, nor that it was not all paid out to other depositors or creditors before the bank closed its doors."

And again, on page 540, after referring to the case of National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693, Judge Hanford says:

"The complainant has failed to bring the case at bar within rule established by the Supreme Court in the above-mentioned decision, by not alleging that any of the money deposited by the treasurer can be traced to the custody of the receiver and identified, or that any of said money has been mingled with the property which has come into his hands."

So that, so far as the decision of the lower court in that case is concerned, it states the law not inconsistently with the claim made by the complainants in this case. And this view is emphasized when we examine the opinion of the Circuit Court of Appeals in the same case. 68 Fed. 979, 16 C. C. A. 81. On page 980 of 68 Fed., page 82 of 16 C. C. A., the opinion says:

"It is not alleged in the bill that any of the money of the complainant, or any assets or property thereby procured, has come into the hands of the receiver. It is true it is averred that the bank still retains $11,355.68 of the complainant's money, but it is not said that any portion of the same was in the possession of the bank when it closed its doors. We interpret the averments of the bill to mean—as in fact it was conceded upon the argument—that the money which the receiver holds is not that which was turned over to him, as such, when the bank closed, but that it is the proceeds of collections made by him since that date. If it had been alleged in the bill that, at the time of its failure, the bank held a sum of money equal to, or less than; the amount here sued for, the court might lawfully presume that sum to be of the public funds of Spokane county, since it will be presumed that trust funds have not been wrongfully misappropriated or criminally used by the officers of the bank."

The court goes on to discuss the general rule, as first amplified in Knatchbull v. Hallett, and lays down the rule in the following language:

"The newer and more equitable doctrine permits him to recover it (that is, the trust property) from any one not an innocent purchaser, and in any shape into which it may have been transmuted, provided he can establish the fact that it is his property, or the proceeds of his property, or that his property has gone into it, and remains in a mass from which it cannot be distinguished."

The only proposition decided by the court in this Spokane County Case is that stated on page 982 of 68 Fed., on page 84 of 16 C. C. A., as follows:

"We are unable to assent to the proposition that, because a trust fund has been used by the insolvent in the course of his business, the general creditors of the estate are by that amount benefited, and that therefore equitable considerations require that the owner of the trust fund be paid out of the estate to their postponement or exclusion."

It is true that some of the courts have gone to that extent; but this case has not been tried upon any such theory, or upon any such claim. But we are not confined to an examination of the Spokane County Case, just cited, to learn what was the view of the Circuit Court of Appeals of the Ninth Circuit. On the very day that it decided Spokane County v. Bank, it also decided City of Spokane v. Bank, 68 Fed. 982, 16 C. C. A. 85. This case grew out of the same failure, and was against the same bank. The lower court had sustained a demurrer to the bill, and this decision the Court of Appeals reversed. The court says, in its opinion, that the bill in the Spokane City Case differs from the Spokane County Case in one important particular:

"It contains the averment that the city treasurer had deposited with the First National Bank of Spokane moneys of the city known by the officers of the bank to be such, and that said officers failed to keep said moneys separate and distinct from other funds, but wrongfully mixed and commingled the same with the money of the bank, and that it has used the same in paying its employés, patrons, clients, and depositors, 'and in the purchase by said defendant, First National Bank, of property, notes, bills, and securities now constituting and forming the assets of said defendant, First National Bank, in the possession of the receiver hereinafter mentioned.' Thereafter follows the allegation that the receiver has, since his appointment, collected of the assets of said bank a sum equal to the amount still due the city. We construe these averments of the bill to distinctly allege that the assets that came into the hands of the receiver were purchased by the bank with the city's money. In the light of the authorities cited in the foregoing decision [Spokane County Case], and of the conclusions there reached, we are of the opinion that the demurrer to this bill should have been overruled."

If the facts in that case were identical with the facts in this case, the bill of complaint could have been framed in the same language.

Much stress is laid on the case of Beard v. Independent District of Pella City, 88 Fed. 375, 31 C. C. A. 562, decided by the Circuit Court of Appeals for the Eighth Circuit. An examination of that case shows that it is entirely in harmony with the case last above cited, and with the conclusion arrived at in this case. A very full discussion of the law is presented by Judge Shiras, who sat with Judges Sanborn and Thayer, and the court arrives at the conclusion that no trust can be declared, because no money was ever deposited in the bank whereby the assets of the bank were increased. The case of San Diego County v. California National Bank (C. C.) 52 Fed. 59, undoubtedly went much further than the Circuit Court in Washington; but both cases are authorities supporting the contention of the complainants here.

In re Mulligan (D. C.) 116 Fed. 715, is an interesting case, in which Judge Lowell discusses the general subject of impressing assets with a

trust, and, in the main, taking the view against liberal allowances in that respect. Referring to the rule that drafts made against an account in a bank are supposed to be paid out of the trustee's own funds, leaving the trust fund in the residuum, he says that the rule is also extended to cases in which the bank itself was the defaulting trustee. The cestui has sometimes been allowed a charge prior to that of the general creditors upon the general cash assets of the defaulting bank, or upon the minimum value of these assets since the date of the trust deposit. If, since that date, the cash assets have at any time fallen below the amount of the trust deposit, it has been held that the trust fund has been dissipated to that extent. A number of cases are cited on page 718. On page 721, in passing upon another phase of the same case, he says that the mingling of another undefined trust with other trust funds so complicates the situation as to make it impossible to apply the principle last referred to, and therefore all the funds go into the general estate.

So that, when we narrowly examine the cases, there would seem to be no real conflict, at least among the federal courts, upon the proposition that, when a trust fund is mingled with other funds of the trustee so as to form an indistinguishable mass, and the whole mass invested in assets which come into the hands of a receiver, a trust will be declared in favor of the beneficiary, and a preference given, to the extent that the trust fund has been, along with other funds, invested in such assets.

Now, in this case, we find a trust fund aggregating $48,289.17 passing into the possession of the bank. Of this, $11,697.61, of cash which remained in the vault of the bank, may be said to be the residue left of the fund, under the rule of law hereinbefore quoted. As to the residue, $36,591.56 was used by the bank in the course of its business. By the course of its business, I mean the usual course of a bank's business. There is no claim made that the books of the bank do not correctly state the business that was done by it, or that any of its money was diverted to improper uses, except as an improper use can be found in the loaning of money to customers who were known to be insolvent by the bank officials at the time the loans were made.

The period of the reception of the deposits covers but little more than three months. The deposits were made between October and February, and the $36,591.56 must therefore have been used in the ordinary course of business, either in payment of obligations of the bank due in the ordinary course, or in the loan of money or purchase of paper or other securities in the ordinary course of business. It therefore follows that, if a portion of this fund was used to pay off debts of the bank, the creditors of the bank are benefited, pro tanto; but it does not appear that any of these funds were used to pay off debts of the bank, as that expression is commonly used, for the condition of the bank did not change, from time to time, from the beginning of these deposits of the county funds until the bank closed. There was no suspicion of its insolvency, and it continued to receive deposits, from time to time, in the usual manner. The daily transactions of the bank were of the same general character over the entire period. The cash balance on

the first day of the deposits was over $24,000, and on the day it closed something over $20,000. During the period in controversy, the transactions of the bank aggregated over $8,000,000, but the difference between the credit and debit transactions was only $4,356.20. So that, considered as a series of business transactions, it cannot be said that the trust fund was used to pay off debts. • If this be true, we are relieved from a consideration of the question as to whether or not, in the case of a trust of this character, where the fund was used prior to the disclosure of insolvency for the paying of debts of the concern, the creditors will be heard to oppose the declaration of the trust as against the proposition that the fund coming into the hands of the assignee or receiver has been increased, pro tanto, and the debts decreased in like amount, by reason of the use of the trust fund.

I think it is fair to say, as a business transaction, that all of this fund, aside from the $11,697.61, was used for the purchase of commercial paper and other securities of the same kind. Now, if the paper bought with this and other funds which the bank had at its disposal all proved to be worthless, no charge could be made against the assets in the hands of the receiver on account of this trust, because, as we are following the trust fund into property which it, with other funds, purchased, we must suffer the consequences if it turns out that the purchased property is valueless. That, to a certain extent, is true in this case. During the period in controversy—that is to say, between October 9, 1903, and February 1, 1904—the bank acquired commercial paper aggregating $142.008.20. A large part of this paper was worthless, and, as to a part of it, the funds of the county were not invested in it. The whole amount collected on account of the moneys loaned during the period while the trust fund existed was $12,825.84. Of this amount, $1,911.76 was collected from loans made between October 8th and November 1st, while during that period only $674.63 was collected on account of taxes; so that we must, of necessity, exclude from the total amount received during the period in controversy the sum of $1,237.13, being the amount collected on account of loans into which the trust fund could not have gone. The amount, therefore, collected by the receiver on account of loans made out of funds with which the trust fund was mingled, is $11.588.71.

Complainant also asserts a claim against the balances on deposit with the various depository banks of the Galion Bank. I cannot certainly trace any part of the trust fund into these depositories. Deposits in these banks were made from time to time; but these were all open accounts, fluctuating from day to day according to the demands for exchange, and affected almost always by the indebtedness of the Galion Bank to the various depositories, and by the amount of rediscounted paper which it handled through them.

It follows, therefore, from this view of the law, that the complainant is entitled to assert, as against the receiver, the right to a repayment of the sum of $23,286.32, being the portion of the trust fund which can be traced into the hands of the receiver, viz., $11,697.61 cash remaining in the bank, and $11,588.71, being the amount collected by the receiver from loans which were made out of funds of which

the trust formed a part; and the residue of the trust fund, to wit, $25,002.85, will be charged against and satisfied, if so much is realized, out of such further collections as the receiver may make on account of these loans.

A decree may be entered accordingly.