### In re SMITH, THORNDYKE & BROWN CO.

(District Court, E. D. Wisconsin. February 17, 1908.)

1. BANKRUPTCY—CLAIMS—PRIORITIES—MONEY DEPOSIT.

The president of a bankrupt corporation was also treasurer of a grocers' association. At the time of his election as treasurer, it was arranged with the association's officers and directors that the funds of the association should be deposited by the treasurer with his corporation and that disbursements from the fund should be paid by its checks. *Held*, that the corporation merely became the debtor of the association to the extent of such general deposits, and that the association's assignee was therefore not entitled to priority over other general creditors of the corporation in the distribution of its assets in bankruptcy.

2. SAME—TRACING FUNDS.

Funds belonging to an association were deposited with a bankrupt; the account of the deposit prior to January, 1907, being kept on the bankrupt's cash book. After that date a new account was opened in a bank therefor, and no further moneys belonging to the association were received by the bankrupt. At the time bankruptcy intervened the balance owing by the bankrupt to the association had been reduced by checks drawn on the bankrupt's general bank balance, and the rest of the bankrupt's bank balance was appropriated by the bank under a banker's lien. *Held* that, as no part of the association's money ever passed into the hands of the bankrupt's trustee, the association's assignee was not entitled to a preference for the amount of such balance as against the bankrupt's general creditors.

### In Bankruptcy.

This is a proceeding to review the order made by the referee in bankruptcy whereby the claim of Mrs. Emma G. Smith was allowed as a preferred claim. There is practically no dispute about the facts. In 1906 Ira B. Smith, then president of the Smith, Thorndyke & Brown Company, a trading corporation of Wisconsin, was elected treasurer of the National Wholesale Grocers' Association. At the time of his election it was arranged with the officers and directors of such Grocers' Association that the funds coming into his hands as treasurer should be deposited with the Smith, Thorndyke & Brown Company, and that disbursements from the fund should be paid by the checks of said company. Practically the arrangement was to use the Smith, Thorndyke & Brown Company as a bank for the Grocers' Association. It was supposed on all hands that the Smith, Thorndyke & Brown Company was solvent. Pursuant to such arrangement Mr. Smith indorsed over all checks and drafts received by him as treasurer of the Grocers' Association to the Smith, Thorndyke & Brown Company, and such moneys were mingled in the general bank account of Smith, Thorndyke & Brown Company. In January, 1907, the Smith, Thorndyke & Brown Company, temporarily embarrassed but supposed to be solvent, called in an attorney to look over their affairs, who found the account with Ira B. Smith, as treasurer, had been kept upon the cash book, and advised that such account be transferred to the ledger of Smith, Thorndyke & Brown Company under the title "Ira B. Smith, Trustee," which was done. Such account then showed a balance due the Grocers' Association of something over $4,000. The attorney testified that such sum was not then

paid over to the Grocers' Association because the company was at that time unable to make such payment. Pursuant to the advice of the attorney a new account was opened in the bank by Ira B. Smith as treasurer, and from that time on all moneys received by him from the Grocers' Association were deposited to that account. From February, 1907, down to May, 1907, certain disbursements were made upon the checks of Smith, Thorndyke & Brown which reduced the balance in that account to $2,156; but no sums were paid over to Smith, Thorndyke & Brown Company after February, 1907. June 10, 1907, bankruptcy proceedings were instituted against Smith, Thorndyke & Brown Company. The balance in the general account of Smith, Thorndyke & Brown Company with the National Exchange Bank was appropriated by the bank to satisfy a banker's lien, which action was ratified and approved by the court, and such bank balance never came into the possession of the trustee. Subsequent to the bankruptcy of the company, Mrs. Smith, the petitioner, who is the wife of Ira B. Smith, borrowed money from her sister to make good the balance due to the Grocers' Association, and took to herself an assignment of such claim. The petition of Mrs. Smith proceeds upon the theory that this indebtedness of $2,156, due the Grocers' Association, constituted a trust fund, so that she is entitled as assignee to payment in full out of the assets of the estate. The referee adopted this view, and directed the payment of the claim in full.

W. J. Turner, for claimant.

Bloodgood, Kemper & Bloodgood, for trustee.

QUARLES, District Judge (after stating the facts as above). It is sometimes profitable to lay aside elaborate briefs, burdened with a multitude of citations, and refer to an elementary principle, which is, after all, the pivot upon which the case must turn. Much has been said in the argument about trusts and trustees, trust moneys, etc. As applied to this case the word "trust" is little more than a figure of speech. It is called by the law writers a constructive trust. Mr. Pomeroy, in his work on Equitable Jurisprudence (section 1044), uses the term "trust in invitum," and the learned author well describes how and why the court of equity has resorted to this fiction to facilitate its peculiar jurisdiction and to work out justice in peculiar cases. It is elementary that, in every instance where the court creates this quasi trust relation, it must find either actual fraud or some unconscientious conduct. In such case the court will fasten upon the property in the hands of the offending party and will convert him into a trustee of the legal title. It may be nothing more than a breach of good faith, as a mingling by an agent of the funds of his principal with his own moneys, or the receipt of a deposit by the officers of a bank when they know the bank to be hopelessly insolvent. There are innumerable variations of tortious conduct which will warrant this interposition of a court of equity; but in every such case there must be at the bottom some unfair dealing or wrongdoing. In the instant case the evidence shows without contradiction that Smith, as treasurer of the Grocers' Association, was at liberty to deposit its funds with the Smith, Thorndyke & Brown Company, that such company were to use such funds, and that disbursements therefrom were to be made by checks upon such company; in other words, nothing has been done either by Smith, or the Smith, Thorndyke & Brown Company, which was not contemplated by the parties, and therefore there would appear to be no just occasion for the application of the trust doctrine.

It is true, as urged, that the trustee has stepped into the shoes of the bankrupt. It is equally true that Mrs. Smith, as the assignee of the Grocers' Association, has by virtue of the assignment acquired no higher or superior right than that possessed by her assignor. This being so, the case stands precisely as though the account had stood upon the books of the Smith, Thorndyke & Brown Company in the name of the Grocers' Association, and the contest were waged between such original parties. The question then would be: What was the legal relationship which these parties sustained to each other? The Grocers' Association had practically consented to employ Smith, Thorndyke & Brown Company as a bank. In Bank v. Millard, 10 Wall. 152, 19 L. Ed. 897, it was settled, so far as the federal courts are concerned, that a general deposit in a bank creates only the relation of debtor and creditor between the depositor and the bank. In Commercial Bank v. Armstrong, 148 U. S. 59, 13 Sup. Ct. 533, 37 L. Ed. 363, it was held that all deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter, and that other kind of deposit of money peculiar to banking business, in which the depositor for his own convenience parts with the title to his money and loans it to the bank. Bank v. Latimer (C. C.) 67 Fed. 27, 29; Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; Bank v. Blackmore, 75 Fed. 771, 774, 21 C. C. A. 514; Metropolitan Bank v. Campbell (C. C.) 77 Fed. 705, 708. There is in the present case no semblance of bailment, because the deposit was general, not special. All that was required of Smith, Thorndyke & Brown Company was to return on demand an equivalent sum. Can there be any doubt, therefore, that as between these original parties there subsisted the relation of debtor and recreditor? And, if so, Mrs. Smith by virtue of her assignment became a creditor, and must share pari passu with other creditors under the terms of the bankruptcy act.

There is another principle which would be equally fatal to the contention of the claimant. It appears that in February, 1907, the Smith, Thorndyke & Brown Company, being temporarily embarrassed, but supposed on all hands to be solvent, called in an attorney to look over its books, who found this account with Smith as treasurer appearing only upon the cash book, and showing a debit balance against the Smith, Thorndyke & Brown Company of about $4,000, which had not been paid because the company had not funds available to pay the same. The attorney advised that this account should be transferred to the general ledger of the company, and that Smith should at once open an account with the bank as treasurer of the Grocers' Association, and thereafter deposit all funds of the association with the bank, which course was pursued. Between that time and June 10, 1907, the date of the filing of the petition in bankruptcy, this balance of $4,000 was reduced to $2,156. Not a dollar of the association money came to the Smith, Thorndyke & Brown Company after February, 1907. The general bank balance of Smith, Thorndyke & Brown Company was appropriated by the bank under a banker's lien, which proceeding was sanctioned by the court, and no part of such money came to the hands of the trustee. Thus it appears that no part of the sum claimed ever

found its way into the assets of the estate. It had been spent and dissipated four months before the bankruptcy proceedings. Under such circumstances no equitable doctrine could be invoked to appropriate general assets of the estate belonging to general creditors to make good this antecedent deficit; no portion of the fund having been traced into the estate. Frelinghuysen v. Nugent (C. C.) 36 Fed. 229; Deere Plow Co. v. McDavid, 137 Fed. 811, 70 C. C. A. 422; Marquette Commissioners v. Wilkinson, 119 Mich. 655, 78 N. W. 893, 44 L. R. A. 493, 498; Spokane v. Bank, 68 Fed. 979), 16 C. C. A. 81; In re Mulligan (D. C.) 116 Fed. 715, 718; Board of Commissioners v. Patterson, 149 Fed. 229, 236; Nonotuck Silk Co. v. Flanders, 87 Wis. 337, 58 N. W. 383; Burnham v. Barth, 89 Wis. 362, 62 N. W. 96.

The fact that money lies in the hands of the persons proceeded against is an indispensable condition. In National Bank v. Insurance Co., 104 U. S. 68, 26 L. Ed. 693, the court employ the familiar illustration:

"For equity will follow the money, even if put into a bag or an undistinguishable mass, by taking out the same quantity."

In such case it is certainly essential to show that the money sought to be recovered went into the bag. Under the evidence in this case it is not a question of tracing a trust fund which has been commingled with other assets of the estate, because the proofs show conclusively that the fund in question here has never come into possession of the trustee.

For these reasons, the order of the referee must be reversed. The record will be returned, with instructions to allow the claim of Mrs. Smith as an unsecured claim, without preference, and for further proceedings in accordance with this opinion.