LUCAS COUNTY v. JAMISON (and 11 similar cases).

(Circuit Court, S. D. Iowa, S. D.   November 4, 1908.)†

No. 15.

1. BANKS AND BANKING (§ 288*)—NATIONAL BANKS—INSOLVENCY—DISTRIBUTION OF ASSETS—PRIORITY.

The fact alone that a deposit of public funds in a national bank by a public officer was wrongful, and known to be so by the bank, does not entitle a claim therefor to priority of payment over those of general creditors on the insolvency of the bank.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 288.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

†Received for publication June 3, 1909.

2. BANKS AND BANKING (§ 288*)—NATIONAL BANKS—INSOLVENCY—DISTRIBU-
TION OF ASSETS—PRIORITY—TRUST FUNDS.

In all cases where an insolvent national bank held funds as trustee, to
entitle a claim therefor to a preference over those of general creditors in
the distribution of the bank's assets, it must be shown that such funds
have not been dissipated, but that they remain in the estate and can be
identified, not by earmarks, but by being traced into the estate and there
now found, to its augmentation.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 288.*]

In Equity.

Mitchell & Hunter, for complainant.

Bartholomew & Bartholomew, for defendant.

SMITH McPHERSON, District Judge.   The first National Bank
of Chariton, Iowa, as the name implies, was a national bank organized
and doing business for a good many years at Chariton, Iowa, under
the national banking laws of the United States.   Its capital stock was
$50,000, of which S. H. Mallory, now deceased, owned at the time
of his death, and for many years, had owned, $49,000; the remaining
$1,000 being owned by Frank R. Crocker, the cashier.   S. H. Mallory
died on or about March, 1903, leaving his widow, Annie L. Mallory,
and his daughter, Jessie M. Thayer, likewise a widow, as his only heirs
and beneficiaries.   On the night of October 30, 1907, the cashier, Frank
R. Crocker, died by suicide.   The Comptroller of the Currency,
through a bank examiner, Mr. H. M. Bostwick, took possession of the
bank the following morning, and the bank was found to be utterly in-
solvent.   The bank had a fine reputation, and was believed by all to
be solvent, earning good dividends, and was believed in all respects to
be conducted and carried on in accordance with the law and good
business principles.   For just what length of time the bank had been
insolvent has not been definitely disclosed; but there is testimony be-
fore the court tending to show that the bank had been insolvent for
three years preceding the time it was closed by the Comptroller.   Be
this as it may, Mr. Crocker, by his peculations and mismanagement
and embezzlements, made the bank insolvent beyond all question, leav-
ing as undisputed and valid claims against the bank in the aggregate
about $1,400,000, with assets of about $600,000.   These statements are
general, and no attempt is made to be precise or definite as to amounts.

Of these cases now under consideration, some were brought in the
first instance in this court, and others were brought in the district court
of Lucas county, Iowa, and transferred to this court, and were all
heard at one and the same time on oral testimony, reduced to writing
as shown by one volume of testimony, with documentary and written
evidence and agreements of parties.   Each of the plaintiffs in these
several cases claims to be a preferred creditor and should be paid in
full, and the question now for decision is:  Are they preferred cred-
itors?   A statement is now made as to each case.

In the case above entitled of Lucas County v. Receiver Jamison,
No. 15 Equity, the facts, briefly stated, are as follows:

The case is in equity.   Section 1457 of the Iowa Code of 1897 as

amended by chapter 36, p. 26, Acts 27th Gen. Assem., in the year 1898, provides in a general way, to be noticed more particularly later on, that the board of supervisors of a county may designate banks as depositories of the public funds received and paid out by the county treasurer. The statute provides for the taking of a bond of such banks, conditioned as provided by statute, and with surety to be approved by the board of supervisors. The evidence before the court does not show what took place between the treasurer and the bank prior to January 6, 1907; but on that day the treasurer had overdrawn, and on the following day, January 7, 1907, the county treasurer commenced to make deposits there, from which time on for many months he had a credit with the bank. April 6, 1907, the board of supervisors adopted a resolution reciting that the treasurer is permitted to deposit in that, as well as other designated banks, and providing that such banks shall have filed a bond with the county auditor of Lucas county, to be approved by the treasurer and the board of supervisors, in double the maximum amount that he may deposit with them, as provided by law, and that such portion of the public funds as may not be required for public use may be deposited on time certificates of deposit bearing interest at the rate of 3 per cent. per annum if such sum is left on deposit for six months, and with a rate of 2 per cent. per annum if such sum is on deposit for three months.

The bank through Crocker, cashier, presented a bond to the treasurer and board of supervisors, which bond is of date April 5, 1907, and filed April 6, 1907, and approved by the board of supervisors April 27, 1907. The signature of the bank, by Crocker, cashier, and of Crocker as security, and C. W. Ramsey and G. W. Larimer, are genuine signatures affixed by the parties. But the signatures of A. L. Mallory and J. M. Thayer, sureties to said bond, were and are forgeries, placed there by Crocker, cashier, by the aid of a rubber stamp, unauthorized by and unknown to Mrs. Mallory and Mrs. Thayer, and without believing that said signatures were genuine the said board of supervisors never would have accepted or approved said bond. Both Mrs. Mallory and Mrs. Thayer were directors of the bank, and had been since the death of Mr. Mallory. May 1, 1907, the treasurer had accumulated more than $30,000 in said bank, on which day the treasurer checked against said funds and in lieu thereof took three time certificates of deposit for $10,000 each, two of which were afterwards paid, leaving one certificate for $10,000 unpaid. The certificate was in the usual form, and was to bear interest at the rate of 3 per cent. if not cashed within six months. When the bank closed there was cash on hand in the bank $42,969.57. Of this $29,000 was in the reserve fund and in a box or vault kept for that purpose, which had been there during all of that year, and consisted of $23,000 in gold and $6,000 silver. This reserve fund parts of the year had been $40,000, and should have been kept at that. The county has a just claim against the bank of $47,116.22, which includes the certificate of deposit of $10,000 above referred to.

On August 14, 1907, the checking account of the treasurer was overdrawn $205.05. From the time the treasurer was overdrawn as to his checking account to the close of the bank the bank never shipped

any currency out to other banks, but did bring in from a Chicago bank $30,000; and from the time he was overdrawn to the close of the bank the treasurer deposited in cash in the bank $16,255.90, the balance of his deposit being by checks and drafts on other banks, and at once sent out by the bank. The drafts and checks amounted to $38,174.45, during which time he checked on said account $10,620.88, plus $700 the day before the bank closed, but which did not go on the books of the bank. From the time the treasurer took office, January 7, 1907, until the adoption of the resolution designating the bank as a depository, the county treasurer deposited with the bank in cash $25,385, not counting drafts and checks received by the bank from the county treasurer.

In the case of Sir William Mosher v. Receiver of the First National Bank of Chariton, Iowa, the facts are:

That October 25, 1907, one I. M. Wood bought of the said bank a draft for $1,550, drawn against the National Bank of the Republic of Chicago, Ill. The said draft was indorsed in due course of business by him, the said Wood, to the complainant herein. When presented to said National Bank of the Republic, payment thereon was refused for lack of funds. Wood purchased said draft with two checks, namely, one, dated October 19th, drawn by Luther Miller on the Cambria Savings Bank, Cambria, Iowa, for $1,500, and the other, dated October 24th, drawn by Curtis Mosher on the Humeston Bank of Humeston, Iowa, for $90; the balance evidently taken in cash from the First National Bank of Chariton, Iowa. These two checks were remitted in the usual course of business to the National Bank of the Republic for collection.

The case of Thomas J. Lovett, Trustee, v. James H. Jamison, Receiver of the First National Bank of Chariton, Iowa, is on the following facts:

Complainant is trustee of the estate of Kemp & Wright, bankrupts. The said bank, by an order of court something like two years ago, was designated under the bankrupt statute as a depository for bankrupt funds; the order requiring said bank to give bond in the penalty of $10,000, with surety. A bond in due form was presented to the judge of the United States District Court, purporting to be signed by Annie L. Mallory and Jessie M. Thayer as sureties; and the judge, believing said bond to be genuine, approved the same. The names of said sureties were forged by Frank R. Crocker, the cashier of the bank, a fact not known until after the bank closed. Plaintiff, as trustee in bankruptcy, deposited the funds of the estate in said bank, aggregating $3,427.30, of which amount he checked out $2,289.52, which checks were paid; the last deposit being July 10, 1907, and the last check being October 2, 1907, leaving a balance due complainant as said trustee of $1,137.78.

The case of Samuel H. Moore, Trustee, v. Jamison, Receiver, is on the following facts:

Samuel H. Moore is trustee in bankruptcy of the estate of Wm. W. Rumble, bankrupt. The case presents precisely the same facts, except dates and amounts, as are presented in the Lovett Case. In this case complainant, as trustee, July 13, 1907, deposited $4,100.80, and later on a small amount, and made his last deposit October 22, 1907, of

$455; and from said funds he checked out moneys, the last being October 20, 1907, leaving a balance of $2,015.78 now due the complainant.

The case of Packers' National Bank of South Omaha v. Jamison, Receiver, is on the following facts:

On October 28, 1907, E. A. Brown, administrator of the estate of a decedent, sent to complainant a check on the First National Bank of Chariton, Iowa, for $855.35. Upon receipt of said check the Packers' National Bank of South Omaha sent said check by mail to the First National Bank of Chariton, Iowa, on which bank the check was drawn, for collection. On receipt thereof the First National Bank of Chariton, Iowa, marked said check as paid and charged the same against the account of Brown, administrator, and sent the Packers' National Bank a draft for the amount on the National Bank of the Republic of Chicago. On receipt of said draft the Packers' National Bank sent said draft to the Corn Exchange National Bank of Chicago for collection, which bank on the following day presented said draft to the National Bank of the Republic for payment, and payment was refused for lack of funds.

The case of E. H. Emery v. Jamison, Receiver, is on the following facts:

October 22, 1907, plaintiff, doing business at Ottumwa, Iowa, drew a sight draft with the bill of lading annexed on Gray, Von Behern & Co., of Chariton, Iowa, on account of a car load of potatoes, for $345. The First National Bank of Chariton, Iowa, presented the sight draft for payment, whereupon Gray, Von Behern & Co. gave its check on the First National Bank of Chariton, Iowa, for the amount, and, said concern having on deposit a sum greater than the amount of the check, said check was marked "Paid," and the amount thereof charged to Gray, Von Behern & Co., all of which was done October 29th. On that day the First National Bank of Chariton issued its draft, payable to the complainant herein for the amount, on the National Bank of the Republic of Chicago and transmitted said draft to the complainant at Ottumwa. On October 30, 1907, complainant deposited said draft in the National Bank of Ottumwa, Iowa, and on the same day the National Bank of Ottumwa, Iowa, sent the draft to the Continental National Bank of Chicago, and October 31, 1907, the Continental National Bank presented said draft to the National Bank of the Republic for payment, and payment was refused for lack of funds.

The case of Chandler Bros. v. Jamison, Receiver, is on the following facts:

Complainants do business at Chariton, Iowa, engaged in buying and selling sheep and importing sheep from Europe. October 28, 1907, plaintiffs had an account with the First National Bank of Chariton, Iowa, and on that day deposited a number of checks and drafts, amounting to $1,003.40; and on that day they bought from the First National Bank of Chariton, Iowa, a draft on the London City Midland Bank of London, England, for £1000, or $4,870, and paid therefor by check on the First National Bank of Chariton, Iowa, which check was charged to their account, leaving them owing an overdraft of some small amount, which was made good the next day. Be-

fore said draft came around the bank was closed, and, of course, payment refused.

The case of Joseph A. Brown v. Jamison, Receiver, is on the following facts:

On the 30th day of October, 1907, plaintiff deposited $2,310.35 in drafts with the First National Bank of Chariton, Iowa, one of $75.35 on the Citizens' Bank of Promise City, Iowa, payable to J. A. Brown, and this draft was sent to the Des Moines Savings Bank, and the First National Bank of Chariton, Iowa, took credit for it. Another draft of $25, dated October 28, 1907, was drawn by the Farmers' Bank of Grand River on the Continental National Bank of Chicago in favor of J. A. Brown, and was remitted by the First National Bank of Chariton to the First National Bank of the Republic on October 30, 1907, and credit was given to the First National Bank of Chariton, Iowa. The third was a draft of $2,200, dated October 28, 1907, drawn by the First National Bank of Creston, Iowa, on the Commercial National Bank, Chicago, payable to J. A. Brown. This draft was remitted to the Merchants' National Bank of Burlington, and placed there to the credit of the First National Bank of Chariton, Iowa. When the $75 check was sent to the Des Moines Savings Bank, and credit taken, the First National Bank had a credit of more than $2,000 in the Savings Bank. When the check of $35 was sent to the National Bank of the Republic, there was a balance due in said bank of about $56,000. When the draft of $2,200 was sent to the Merchants' National Bank of Burlington, the First National Bank of Chariton, Iowa, was overdrawn in the amount of $1,155.09; and the draft of $2,200 was taken to pay the overdraft, and the balance left to the credit of the First National Bank of Chariton, Iowa, which balance was $1,157.36, which the defendant, as receiver, received in cash.

The case of Guy Patterson v. Jamison, Receiver, is on the following facts:

One Paine had sold some real estate to plaintiff, Patterson. Paine executed a deed, and left the same with the cashier, Crocker. The deed was to be delivered to Patterson when an abstract of title was furnished showing a good title to the land bought. Patterson was to pay Paine $1,000 when the abstract was furnished and $1,350 at a later time, when the deed was to be delivered and possession of the real estate to be taken by Patterson. Patterson deposited certificates of deposit on the First National Bank of Chariton, Iowa, with Crocker, the certificates aggregating $385, and certificates of deposit on other banks aggregating $420. He may have deposited a small amount in money. At all events he lacked $115 of leaving the $1,000. He gave his note to Crocker's bank for $115, and for this note and the deposits thus made he took a certificate of deposit of Crocker's bank for $1,000, payable on the face thereof to Paine. These transactions all occurred October 26, 1907. Before anything further was done the bank closed.

The case of J. H. Wood v. Jamison, Receiver, is on the following facts:

September 18, 1907, plaintiff sent from Kansas to Crocker's bank a note for $170.45 on a party for collection. Later on, but just when does not appear, the bank presented the note to the maker, who took

up the note by giving his check therefor on some bank, and Crocker's bank obtained the proceeds of the check, but never remitted to plaintiff. None of these dates appear, other than when the note was sent for collection.

The case of William Sones v. Jamison, Receiver, is on the following facts:

Plaintiff had bought a piece of land subject to a mortgage of $1,200 and interest thereon. The note and mortgage were payable at the First National Bank of Chariton, Iowa, due and payable October 26, 1907. October 24, 1907, plaintiff left with the bank in Lacona, Iowa, the sum of $1,260 for the purpose of discharging said mortgage. That bank and the Chariton bank had business relations with each other, and the Lacona bank, instead of remitting the money for the payment of the mortgage, gave the Chariton bank credit therefor and sent to the Chariton bank a credit slip, but which was not entered upon the books of the Chariton bank. The bank obtained no part of said money, nor any benefit therefrom, other than by taking credit on the books of the Lacona bank for the amount.

The case of McKlveen & Eikenberry v. Jamison, Receiver, is on the following facts:

October 30, 1907, plaintiff deposited a check of $11.84 and one of $27.14, given by William Baxter to Eikenberry & Co., said checks being on the First National Bank of Chariton; and plaintiff was given credit therefor, and the maker of the checks charged therewith. On the same date plaintiff deposited with the First National Bank of Chariton, Iowa, a draft of $819.24 on the Continental National Bank of Chicago, drawn by the Ottumwa National Bank and payable to McKlveen & Eikenberry. Said draft was sent by the First National Bank of Chariton, Iowa, to the National Bank of the Republic of Chicago, and credit was given the First National Bank of Chariton, Iowa, on October 30, 1907.

As applicable to several of the foregoing cases, the following facts are to be considered:

August 9, 1907, the defendant bank issued its certificates of deposit for $75,000, payable to the National Bank of the Republic, Chicago, the same being in the usual form, which certificates the National Bank of the Republic held and received payment thereon as hereinafter stated. When the Chariton bank closed its doors, it had on deposit, subject to check or draft, with the National Bank of the Republic, $54,-408.50. October 31, 1907, the day following the closing of the bank, the National Bank of the Republic wiped out said credit of the Chariton bank and applied said amount of $54,408.50 on said certificate of deposit and indorsed the amount thereon. On the following day, November 1, 1907, another draft came in that had been remitted by the Chariton bank of $2,041.54, and the National Bank of the Republic credited that amount on the said certificate of deposit and made the credit thereon. When the Chariton bank borrowed money from the National Bank of the Republic and gave its certificate of deposit therefor, it put up as collateral security $75,000 face value of bonds, owned by the Chariton bank, given by the Michigan City & La Porte Traction Railway Company, having certain interest coupons thereto

annexed. January 6, 1908, the National Bank of the Republic collected coupons of said bonds amounting to $1,875, and credited said amount on said certificate of deposit. January 20, 1908, the defendant bank, through its receiver, paid the balance of said certificate of deposit of $19,170.10, thereby extinguishing said certificate of deposit, and took up said collaterals of $75,000, which the receiver still holds as assets of the bank.

As between the First National Bank of Chariton, and the National Bank of the Republic, Chicago, there had been many transactions for quite a period of time; the Chicago bank being a correspondent of the First National Bank of Chariton. It will serve no purpose by going back of August 9, 1907, and perhaps that date is not very material. But August 9, 1907, the Chariton bank had to its credit with the National Bank of the Republic $9,787.10. On that day the certificate of deposit above alluded to was given, and by the time it was received by the bank at Chicago a day or two had elapsed, when the bank at Chicago gave the Chariton bank credit for the amount of the certificate, thereby increasing the deposit so that on August 12, 1907, the Chariton bank had to its credit $88,090.76; and from that time on until the bank closed its doors it never had a credit with the bank at Chicago exceeding that amount, with the exception of for a day or two, when it was increased slightly, but at once dropped back to an amount less than the amount last stated, until, when the bank closed its doors, it had on deposit $56,000 as above stated, which was extinguished by the application of said amount on said certificate of deposit.

It will be kept in mind that the court is dealing with a national bank, and that such a bank is a part of the general government's financial system, as was held in the case of Easton v. Iowa, 188 U. S. 220, 23 Sup. Ct. 288, 47 L. Ed. 452, reversing the Iowa Supreme Court. It was there held that the Iowa statutes relating to banks do not and cannot in any sense control national banks, for the reason that they are government agencies. If the Iowa statutes do not cover nor control national banks, it can be said with equal force that the decisions of the Iowa courts are in no way controlling, but are persuasive only to the extent of considering them in connection with the views of the other courts of the country. However, a brief review of some cases will show what the Iowa courts have decided.

Independent District v. King, 80 Iowa, 497, 45 N. W. 908, held that a school treasurer was a preferential creditor for public funds, the bank knowing the fact that the deposits were public moneys and deposited in violation of law, and that when the bank failed there was more money on hand than the public moneys thus deposited. That decision was made in the year 1890.

Davenport Plow Company v. Lamp (decided the same year) 80 Iowa, 722, 45 N. W. 1049, 20 Am. St. Rep. 442, is largely to the same effect, holding in effect that the relation of debtor and creditor did not exist, but that by reason of the wrongful acts a trust was created.

Brook v. King, 104 Iowa, 713, 74 N. W. 683, holds that one who deposits money in a bank for the sale of land is entitled to a preference.

Officer v. Officer, 120 Iowa, 389, 94 N. W. 947, 98 Am. St. Rep. 365, was in relation to deposits made by an executor. The gist of the opinion is to the effect that if the deposit was wrongful, "and the bank had notice of the character of the funds, there is no doubt that the claim should be given a preference."

Officer v. Officer, 127 Iowa, 347, 101 N. W. 484, need only be cited, as it was grounded on a contract.

Page County v. Rose, 130 Iowa, 296, 106 N. W. 744, 5 L. R. A. (N. S.) 886, was a case wherein taxpayers gave their checks on the bank for the amount of their taxes. The bank debited the taxpayers and credited the county treasurer with the amounts of the checks, and later on tax receipts were sent by the county treasurer to the taxpayers, pursuant to a custom or practice. The bank was not a designated depository. It was held that the county was to be preferred as against other creditors.

That the foregoing Iowa cases are in conflict with the great weight of authority and are wrong in principle I have no doubt. The more recent case of Hansen v. Roush, 116 N. W. 1061, by the Iowa Supreme Court, comes much nearer that which I believe to be the correct rule. There it was held that, before a preference would arise for enforcement, the following facts must exist: (1) There must be an express trust; (2) or by reason of the trust character of the deposit; (3) as money has no earmarks, it must appear that the assets have been increased by such trust deposits, and that they may be taken without prejudice to the rights of other creditors.

Since the argument of the cases at bar, the Iowa Supreme Court has decided the case of Brown v. Sheldon Bank, 117 N. W. 289. That was a case involving many alleged preferences, some of which were allowed, and others denied. One claim was thus allowed wherein the proceeds passed into the hands of the receiver. Another claim was denied; the holding being that a deposit by a school treasurer in his name as such did not entitle him to a preference. Another claim was given a preference as to the county by reason of the county treasurer making the deposit when the bank had not been designated as a depository by the county board, but denied the treasurer such preference. By the opinion the test does not seem to be as to whether the deposits could be traced through the bank to the receiver as to amounts so deposited, and that it is not material if the money has been dissipated.

It is said in one of the Iowa cases that to deposit public funds in a bank not designated as a depository is an indictable offense. That cannot be so, because there is no statute denouncing such acts, and a crime never exists by intendment. But in my opinion the Iowa rule is not the correct one, although other courts have made like holdings. But the weight of authority and the better reasons are to the contrary. It is not enough to show that the deposit was a wrongful act upon the part of either the depositor or the bank. Nor is it enough to show that the bank knew the deposit to be of public funds. These things must exist, with the further fact that the estate has been enlarged, with the still further fact that the money can be traced and shown to be part of the funds or assets at the time of the distribution. Lowe v. Jones,

192 Mass. 91, 78 N. E. 402, 6 L. R. A. (N. S.) 487, 116 Am. St. Rep. 225; Hauk v. Van Ingen, 196 Ill. 21, 38, 39, 63 N. E. 705; Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; Board v. Union Trust Company, 136 Mich. 454, 99 N. W. 373; Board v. Wilkinson, 119 Mich. 655, 78 N. W. 893, 44 L. R. A. 493.

In the case of Page County v. Rose, 130 Iowa, 296, 106 N. W. 744, 5 L. R. A. (N. S.) 886, annotated in 8 Am. & Eng. Ann. Cas. 114, it is said in the notes:

"There is a conflict of opinion among the authorities as to whether, in the absence of statute, there exists in any political subdivision a common-law right to have its debts paid to it in preference to other creditors when the debtor is insolvent. But, as applied to insolvent banks in which deposits of public money have been made, the better rule seems to be that, in the absence of statute or a showing of facts sufficient to create a trust, a claim for public money has no preference over the claims of the general creditors, but stands on the same footing with them."

In Chosen Freeholders v. State Bank, 29 N. J. Eq. 268, affirmed in 30 N. J. Eq. 311, it is held that the prerogative of the English crown to have the debts due the crown first paid out of an insolvent estate is antagonistic to the cardinal objects of a free government. But the courts of Maryland, Georgia, Wyoming, and perhaps some others, hold otherwise. But if the facts are such as to show that the relation of creditor and debtor did not exist, but that of a trust, then there is a preference, and then the question is that of identity of moneys with the receiver. If the funds have been dissipated, so that it cannot be traced, then there can be no preference ordered.

In the case of Lowe v. Jones, 192 Mass. 94, 78 N. E. 402, 6 L. R. A. (N. S.) 487, 116 Am. St. Rep. 225, as annotated in 7 Am. & Eng. Ann. Cas. 551, it is said in a footnote (page 558):

"In the federal courts it is the generally accepted rule that the trust property must be clearly traced and shown to reside in the assets at the time when they are being distributed. Illinois Trust, etc., Bank v. Smith (C. C.) 15 Fed. 858, 21 Blatchf. (U. S.) 275; Peters v. Bain, 133 U. S. 693, 10 Sup. Ct. 354, 33 L. Ed. 696; San Diego County v. California Nat. Bank (C. C.) 52 Fed. 59; Spokane County v. Clark (C. C.) 61 Fed. 538; Multnomah County v. Oregon Nat. Bank (C. C.) 61 Fed. 912; Spokane County v. Spokane First Nat. Bank, 68 Fed. 979, 29 U. S. App. 707, 16 C. C. A. 81; Quin v. Earle (C. C.) 95 Fed. 728; Richardson v. New Orleans Debenture Redemption Co., 102 Fed. 780, 42 C. C. A. 619, 52 L. R. A. 67; In re Marsh (D. C.) 116 Fed. 396; In re Gaskill (D. C.) 130 Fed. 235. In Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, the rule was stated and applied in the following language: 'Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. The right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried. The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed—that is to say, the stock on hand, finished and unfinished (manufacturing materials)—were either in whole or in part the proceeds of any money unlawfully abstracted from the bank.'

"In Philadelphia Nat. Bank v. Dowd (C. C.) 39 Fed. 172, 2 L. R. A. 480, it was held that trust funds held by a bank as trustee must be traced into some specific investment or fund, and that if they have been commingled with the general assets, so they cannot be distinguished, there can be no preference. But that holding was disapproved of in Massey v. Fisher (C. C.) 62 Fed. 958, where it was held that if the money can be traced into the vaults of the bank, and an equal or greater amount remains there, it is a sufficient identification.

"Where a bank is acting as a trustee, it has been held that in paying out funds it will be presumed to have paid out funds other than those which it held in trust, and that, if the cash on hand in the bank has ever fallen below the amount of the trust fund, the minimum amount which it held at any time was the amount to be applied to the trust. Boone County Nat. Bank v. Latimer (C. C.) 67 Fed. 27; In re Dunning, 94 Fed. 709, 36 C. C. A. 437. And the rule has been applied in a case other than where a bank is trustee. Metropolitan Nat. Bank v. Campbell Commission Co. (C. C.) 77 Fed. 705. But a later decision holds that the rule has no proper application except in the capacity of a trustee. In re Mulligan (D. C.) 116 Fed. 715. See, also, Moreland v. Brown, 86 Fed. 722, 30 C. C. A. 23.

"In Crawford County v. Patterson (C. C.) 149 Fed. 229, it appeared that the cashier of a bank was made deputy county treasurer, and proceeded to collect taxes at the bank and mingle the funds generally with those of the bank. The bank became insolvent, and the county attempted to establish a preferred claim against its assets for the amount of taxes held by the bank; it being shown that the bank was a trustee. Further, it appeared that from the beginning of the period during which the taxes were collected until the bank closed its doors no money had been paid out on obligations owing by it, but that a large amount had been paid out on discounts. On this state of facts the court held that the county could claim as trust money a sum equal to the minimum cash balance in the hands of the bank at any time during the period, during which the collections of taxes were made and to the proceeds of all loans which were made during the same period."

It is not practical, nor within reasonable limits can the scores of cases cited by counsel be reviewed. Holding, as I do, that the deposits must have been wrongful and a trust created, I still further hold that the funds must be identified, not by "earmarks," but traced into the estate, and there now found by an augmentation of the estate. If the alleged trust funds have been dissipated, then the cases are at an end; and with but one single exception such are the facts. In the case of Joseph A. Brown against the receiver it is shown by the evidence that the receiver received and now has $1,157.36 of such a deposit. This should be paid back to him in full, and by so doing the other creditors suffer nothing by the entire transaction; but as to all other cases the claimants have no right to be paid in full at the expense of other creditors. Any conclusion that may be reached works a hardship. But the hardship comes from the insolvency of the bank, and not from the holding of this court. All the creditors became such by reason of their confidence in the bank and its managing officer, in whom they believed and upon whom they relied. They believed him an honest man and a man of sagacity in business affairs. They thought they knew him, but they did not. In fact he was an embezzler and defaulter and a forger innumerably often. He wronged them and wronged the stockholders. But the other creditors never wronged these plaintiffs, who now ask to be paid in full; and, if they are paid in full, the other creditors must pay them by having their own dividends diminished. But this is not equity nor fair dealing,

and in my opinion neither law nor equity jurisprudence requires other creditors to pay them.

Here are 12 cases; but the court knows that there is still another on its docket, in which a preference of more than $100,000 is asked. And so it will be seen that, if preferences could be allowed in these cases, then the other case, involving so large an amount, might cover the same funds. But that is only mentioned to show where the preferences could be carried if the argument of plaintiff's counsel is sound. But the truth is that these credits of claimants went into the general business, and what were not stolen and embezzled, and thrown on the Stock Exchange, went into the Chicago bank, resulting in that large transaction; and that bank had the right to, and did, apply the balance in its hands on its indebtedness.

The result is that the decrees will be that of confirming claimants as general creditors, and general creditors only. The one exception is that of Joseph A. Brown, who will be given a preference to the extent of $1,157.36. Complainants will pay the costs, except in the one case, and in that the receiver will pay them.